# UNITED STATES *v.* WHITE MOUNTAIN APACHE TRIBE

No. 01–1067.   Argued December 2, 2002—Decided March 4, 2003

SOUTER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, GINSBURG, and BREYER, JJ., joined. GINSBURG, J., filed a concurring opinion, in which BREYER, J., joined, *post*, p. 479. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and KENNEDY, JJ., joined, *post*, p. 481.

*Gregory G. Garre* argued the cause for the United States. With him on the briefs were *Solicitor General Olson, Assistant Attorney General Sansonetti, Deputy Solicitor General Kneedler, Elizabeth Ann Peterson,* and *James M. Upton.*

*Robert C. Brauchli* argued the cause and filed a brief for respondent.*

JUSTICE SOUTER delivered the opinion of the Court.

The question in this case arises under the Indian Tucker Act: does the Court of Federal Claims have jurisdiction over the White Mountain Apache Tribe's suit against the United States for breach of fiduciary duty to manage land and improvements held in trust for the Tribe but occupied by the Government. We hold that it does.

## I

The former military post of Fort Apache dates back to 1870 when the United States established the fort within territory that became the Tribe's reservation in 1877. In 1922, Congress transferred control of the fort to the Secretary of the Interior (Secretary) and, in 1923, set aside about 400 acres, out of some 7,000, for use as the Theodore Roosevelt Indian School. Act of Jan. 24, 1923, ch. 42, 42 Stat. 1187.

---

*\*John E. Echohawk* and *Tracy A. Labin* filed a brief for the National Congress of American Indians as *amicus curiae* urging affirmance.

Congress attended to the fort again in 1960, when it provided by statute that "former Fort Apache Military Reservation" would be "held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose." Pub. L. 86–392, 74 Stat. 8 (1960 Act). The Secretary exercised that right, and although the record does not catalog the uses made by the Department of the Interior, they extended to about 30 of the post's buildings and appurtenances, a few of which had been built when the Government first occupied the land. Although the National Park Service listed the fort as a national historical site in 1976, the recognition was no augury of fortune, for just over 20 years later the World Monuments Watch placed the fort on its 1998 List of 100 Most Endangered Monuments. Brief for Respondent 3.

In 1993, the Tribe commissioned an engineering assessment of the property, resulting in a finding that as of 1998 it would cost about $14 million to rehabilitate the property occupied by the Government in accordance with standards for historic preservation. This is the amount the Tribe sought in 1999, when it sued the United States in the Court of Federal Claims, citing the terms of the 1960 Act, among others,[1] and alleging breach of fiduciary duty to "maintain, protect, repair and preserve" the trust property. App. to Pet. for Cert. 37a.

The United States moved to dismiss for failure to state a claim upon which relief might be granted and for lack of subject-matter jurisdiction. While the Government acknowledged that the Indian Tucker Act, 28 U. S. C. § 1505, invested the Court of Federal Claims with jurisdiction to

---

[1] These included the Snyder Act, 42 Stat. 208, as amended, 25 U. S. C. § 13, and the National Historic Preservation Act, 80 Stat. 915, 16 U. S. C. § 470 et seq.

render judgments in certain claims by Indian tribes against the United States, including claims based on an Act of Congress, it stressed that the waiver operated only when underlying substantive law could fairly be interpreted as giving rise to a particular duty, breach of which should be compensable in money damages. The Government contended that jurisdiction was lacking here because no statute or regulation cited by the Tribe could fairly be read as imposing a legal obligation on the Government to maintain or restore the trust property, let alone authorizing compensation for breach.[2]

The Court of Federal Claims agreed with the United States and dismissed the complaint for lack of jurisdiction, relying primarily on the two seminal cases of tribal trust claims for damages, *United States* v. *Mitchell*, 445 U. S. 535 (1980) *(Mitchell I)*, and *United States* v. *Mitchell*, 463 U. S. 206 (1983) *(Mitchell II)*. *Mitchell I* held that the Indian General Allotment Act (Allotment Act), 24 Stat. 388, as amended, 25 U. S. C. § 331 *et seq.* (1976 ed.) (§§ 331–333 repealed 2000), providing that "the United States does and will hold the land thus allotted . . . in trust for the sole use and benefit of the Indian," § 348; *Mitchell I, supra,* at 541, established nothing more than a "bare trust" for the benefit of tribal members. *Mitchell II, supra,* at 224. The general trust provision established no duty of the United States to manage timber resources, tribal members, rather, being "responsible for using the land," "occupy[ing] the land," and "manag[ing] the land." 445 U. S., at 542–543. The opposite result obtained in *Mitchell II,* however, based on timber

---

[2] Although it appears that the United States has not yet relinquished control of any of the buildings, the United States concedes that "some buildings have fallen into varying states of disrepair, and a few structures have been condemned or demolished." Brief for United States 4. For present purposes we need not address whether or how this affects the Tribe's claims.

management statutes, 25 U. S. C. §§ 406–407, 466, and regulations, 25 CFR pt. 163 (1983), under which the United States assumed "elaborate control" over the tribal forests. 463 U. S., at 209, 225. *Mitchell II* identified a specific trust relationship enforceable by award of damages for breach. *Id.,* at 225–226.

Here, the Court of Federal Claims compared the 1960 Act to the Allotment Act in *Mitchell I,* as creating nothing more than a "bare trust." It saw in the 1960 Act no mandate that the United States manage the site on behalf of the Tribe, and thus no predicate in the statutes and regulations identified by the Tribe for finding a fiduciary obligation enforceable by monetary relief.

The Court of Appeals for the Federal Circuit reversed and remanded, on the understanding that the United States's use of property under the proviso of the 1960 Act triggered the duty of a common law trustee to act reasonably to preserve any property the Secretary had chosen to utilize, an obligation fairly interpreted as supporting a claim for money damages. The Court of Appeals held that the provision for the Government's exclusive control over the building actually occupied raised the trust to the level of *Mitchell II,* in which the trust relationship together with Government's control over the property triggered a specific responsibility.

Chief Judge Mayer dissented on the understanding that the 1960 Act "carve[d] out" from the trust the portions of the property that the Government is entitled to use for its own benefit, with the consequence that the Tribe held only a contingent future interest in the property, insufficient to support even a common law action for permissive waste. 249 F. 3d 1364, 1384 (2001).

We granted certiorari to decide whether the 1960 Act gives rise to jurisdiction over suits for money damages against the United States, 535 U. S. 1016 (2002), and now affirm.

## II

### A

Jurisdiction over any suit against the Government re-
quires a clear statement from the United States waiving sov-
ereign immunity, *Mitchell I, supra,* at 538–539, together
with a claim falling within the terms of the waiver, *Mitchell
II, supra,* at 216–217. The terms of consent to be sued may
not be inferred, but must be "unequivocally expressed,"
*Mitchell I, supra,* at 538 (quoting *United States* v. *King,* 395
U. S. 1, 4 (1969)) (internal quotation marks omitted), in order
to "define [a] court's jurisdiction," *Mitchell I, supra,* at 538
(quoting *United States* v. *Sherwood,* 312 U. S. 584, 586 (1941))
(internal quotation marks omitted). The Tucker Act con-
tains such a waiver, *Mitchell II, supra,* at 212, giving the
Court of Federal Claims jurisdiction to award damages upon
proof of "any claim against the United States founded either
upon the Constitution, or any Act of Congress," 28 U. S. C.
§ 1491(a)(1), and its companion statute, the Indian Tucker
Act, confers a like waiver for Indian tribal claims that "other-
wise would be cognizable in the Court of Federal Claims if
the claimant were not an Indian tribe," § 1505.

Neither Act, however, creates a substantive right enforce-
able against the Government by a claim for money damages.
*Mitchell I, supra,* at 538–540; *Mitchell II, supra,* at 216. As
we said in *Mitchell II,* a statute creates a right capable of
grounding a claim within the waiver of sovereign immunity
if, but only if, it "can fairly be interpreted as mandating com-
pensation by the Federal Government for the damage sus-
tained." 463 U. S., at 217 (quoting *United States* v. *Testan,*
424 U. S. 392, 400 (1976)) (internal quotation marks omitted).

This "fair interpretation" rule demands a showing demon-
strably lower than the standard for the initial waiver of
sovereign immunity. "Because the Tucker Act supplies a
waiver of immunity for claims of this nature, the separate
statutes and regulations need not provide a second waiver

of sovereign immunity, nor need they be construed in the manner appropriate to waivers of sovereign immunity." *Mitchell II, supra,* at 218–219. It is enough, then, that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages. While the premise to a Tucker Act claim will not be "lightly inferred," 463 U. S., at 218, a fair inference will do.

### B

The two *Mitchell* cases give a sense of when it is fair to infer a fiduciary duty qualifying under the Indian Tucker Act and when it is not. The characterizations of the trust as "limited," *Mitchell I,* 445 U. S., at 542, or "bare," *Mitchell II, supra,* at 224, distinguish the Allotment Act's trust-in-name from one with hallmarks of a more conventional fiduciary relationship. See *United States* v. *Navajo Nation, post,* at 504 (discussing §§ 1 and 2 of the Allotment Act in *Mitchell I* as having "removed a standard element of a trust relationship"). Although in form the United States "h[e]ld the land . . . in trust for the sole use and benefit of the Indian," 25 U. S. C. § 348, the statute gave the United States no functional obligations to manage timber; on the contrary, it established that "the Indian allottee, and not a representative of the United States, is responsible for using the land," that "the allottee would occupy the land," and that "the allottee, and not the United States, was to manage the land." *Mitchell I,* 445 U. S., at 542–543. Thus, we found that Congress did not intend to "impose any duty" on the Government to manage resources, *id.,* at 542; cf. *Mitchell II, supra,* at 217–218, and we made sense of the trust language, considered without reference to any statute beyond the Allotment Act, as intended "to prevent alienation of the land" and to guarantee that the Indian allottees were "immune from state taxation," *Mitchell I, supra,* at 544.

The subsequent case of *Mitchell II* arose on a claim that did look beyond the Allotment Act, and we found that stat-

utes and regulations specifically addressing the management of timber on allotted lands raised the fair implication that the substantive obligations imposed on the United States by those statutes and regulations were enforceable by damages. The Department of the Interior possessed "comprehensive control over the harvesting of Indian timber" and "exercise[d] literally daily supervision over [its] harvesting and management," *Mitchell II, supra,* at 209, 222 (quoting *White Mountain Apache Tribe* v. *Bracker,* 448 U. S. 136, 145, 147 (1980)) (internal quotation marks omitted), giving it a "pervasive" role in the sale of timber from Indian lands under regulations addressing "virtually every aspect of forest management," *Mitchell II, supra,* at 219, 220. As the statutes and regulations gave the United States "full responsibility to manage Indian resources and land for the benefit of the Indians," we held that they "define[d] . . . contours of the United States' fiduciary responsibilities" beyond the "bare" or minimal level, and thus could "fairly be interpreted as mandating compensation" through money damages if the Government faltered in its responsibility. 463 U. S., at 224–226.

## III

### A

The 1960 Act goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee and liable in damages for breach. The statutory language, of course, expressly defines a fiduciary relationship[3] in the provision that Fort Apache be "held by the United

---

[3] Where, as in *Mitchell II,* 463 U. S. 206, 225 (1983), the relevant sources of substantive law create "[a]ll of the necessary elements of a common-law trust," there is no need to look elsewhere for the source of a trust relationship. We have recognized a general trust relationship since 1831. *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 16 (1831) (characterizing the relationship between Indian tribes and the United States as "a ward to his guardian"); *Mitchell II, supra,* at 225 (discussing "the undisputed existence of a general trust relationship between the United States and the Indian people").

States in trust for the White Mountain Apache Tribe." 74 Stat. 8. Unlike the Allotment Act, however, the statute proceeds to invest the United States with discretionary authority to make direct use of portions of the trust corpus. The trust property is "subject to the right of the Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for the purpose," *ibid.*, and it is undisputed that the Government has to this day availed itself of its option. As to the property subject to the Government's actual use, then, the United States has not merely exercised daily supervision but has enjoyed daily occupation, and so has obtained control at least as plenary as its authority over the timber in *Mitchell II*. While it is true that the 1960 Act does not, like the statutes cited in that case, expressly subject the Government to duties of management and conservation, the fact that the property occupied by the United States is expressly subject to a trust supports a fair inference that an obligation to preserve the property improvements was incumbent on the United States as trustee. This is so because elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch. "One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets," *Central States, Southeast & Southwest Areas Pension Fund* v. *Central Transport, Inc.*, 472 U. S. 559, 572 (1985) (citing G. Bogert & G. Bogert, Law of Trusts and Trustees § 582, p. 346 (rev. 2d ed. 1980)); see *United States* v. *Mason*, 412 U. S. 391, 398 (1973) (standard of responsibility is "such care and skill as a man of ordinary prudence would exercise in dealing with his own property" (quoting 2 A. Scott, Trusts 1408 (3d ed. 1967) (internal quotation marks omitted))); Restatement (Second) of Trusts § 176 (1957) ("The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property"). Given this duty on the part of the trustee to preserve corpus,

"it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties."[4]  *Mitchell II, supra,* at 226.

## B

The United States raises three defenses against this conclusion, the first being that the property occupied by the Government is not trust corpus at all.   It asserts that in the 1960 Act Congress specifically "carve[d] out of the trust" the right of the Federal Government to use the property for the Government's own purposes.   Brief for United States 24–25 (emphasis deleted).   According to the United States, this carve-out means that the 1960 Act created even less than the "bare trust" in *Mitchell I.*   But this position is at odds with a natural reading of the 1960 Act.   It provided that "Fort Apache" was subject to the trust; it did not read that the trust consisted of only the property not used by the Secretary.   Nor is there any apparent reason to strain to avoid the straightforward reading; it makes sense to treat even the property used by the Government as trust property, since any use the Secretary would make of it would presumably be intended to redound to the benefit of the Tribe in some way.

Next, the Government contends that no intent to provide a damages remedy is fairly inferable, for the reason that "[t]here is not a word in the 1960 Act—the only substantive

---

[4] The proper measure of damages is not before us.   We mean to imply nothing about the relevance of any historic building or preservation standards.   Neither do we address the significance of the fact that a trustee is generally indemnified for the cost of upkeep and maintenance.   See Restatement (Second) of Trusts § 244 (1957) ("The trustee is entitled to indemnity out of the trust estate for expenses properly incurred by him in the administration of the trust").   Nor do we reach the issue whether a rent-free occupant is obligated to supply funds to maintain the property it benefits from.   See Restatement of Property § 187, Comment *b* (1936) ("When the right of the owner of the future interest is that the owner of the estate for life shall do a given act, as for example, . . . make repairs . . . then this right is made effective through compelling by judicial action the specific doing of the act").

source of law on which the Tribe relies—that suggests the existence of such a mandate." Brief for United States 28. The argument rests, however, on a failure to appreciate either the role of trust law in drawing a fair inference or the scope of *United States* v. *Testan*, 424 U. S. 392 (1976), and *Army and Air Force Exchange Service* v. *Sheehan*, 456 U. S. 728 (1982), cited in support of the Government's position.

To the extent that the Government would demand an explicit provision for money damages to support every claim that might be brought under the Tucker Act, it would substitute a plain and explicit statement standard for the less demanding requirement of fair inference that the law was meant to provide a damages remedy for breach of a duty. To begin with, this would leave *Mitchell II* a wrongly decided case, for one would look in vain for a statute explicitly providing that inadequate timber management would be compensated through a suit for damages. But the more fundamental objection to the Government's position is that, if carried to its conclusion, it would read the trust relation out of Indian Tucker Act analysis; if a specific provision for damages is needed, a trust obligation and trust law are not. And this likewise would ignore *Mitchell I*, where the trust relationship was considered when inferring that the trust obligation was enforceable by damages. To be sure, the fact of the trust alone in *Mitchell I* did not imply a remedy in damages or even the duty claimed, since the Allotment Act failed to place the United States in a position to discharge the management responsibility asserted. To find a specific duty, a further source of law was needed to provide focus for the trust relationship. But once that focus was provided, general trust law was considered in drawing the inference that Congress intended damages to remedy a breach of obligation.

*Sheehan* and *Testan* are not to the contrary; they were cases without any trust relationship in the mix of relevant fact, but with affirmative reasons to believe that no damages

remedy could have been intended, absent a specific provision. In *Sheehan*, specific authorization was critical because of a statute that generally granted employees the damages remedy petitioner sought, but "expressly denie[d] that cause of action" to Army and Air Force Exchange Service personnel, such as petitioner. 456 U. S., at 740. In *Sheehan*, resting in part on *Testan*, the Tucker Act plaintiffs unsuccessfully asserted that the Court of Claims had jurisdiction over a claim against the United States for money damages for allegedly improper job classifications under the Classification Act. We stressed that no provision in the statute "expressly makes the United States liable," *Testan*, 424 U. S., at 399, and rather, that there was a longstanding presumption against petitioner's argument. "The established rule is that one is not entitled to the benefit of a position until he has been duly appointed to it . . . . The Classification Act does not purport by its terms to change that rule, and we see no suggestion in it or in its legislative history that Congress intended to alter it." *Id.*, at 402. Thus, in both *Sheehan* and *Testan* we required an explicit authorization of a damages remedy because of strong indications that Congress did not intend to mandate money damages. Together they show that a fair inference will require an express provision, when the legal current is otherwise against the existence of a cognizable claim. But that was not the case in *Mitchell II* and is not the case here.

Finally, the Government argues that the inference of a damages remedy is unsound simply because damages are inappropriate as a remedy for failures of maintenance, prospective injunctive relief being the sole relief tailored to the situation. Reply Brief for United States 19. We think this is clearly wrong. If the Government is suggesting that the recompense for run-down buildings should be an affirmative order to repair them, it is merely proposing the economic (but perhaps cumbersome) equivalent of damages. But if it is suggesting that relief must be limited to an injunction to

toe the fiduciary mark in the future, it would bar the courts from making the Tribe whole for deterioration already suffered, and shield the Government against the remedy whose very availability would deter it from wasting trust property in the period before a Tribe has gone to court for injunctive relief. *Mitchell II*, 463 U. S., at 227 ("Absent a retrospective damages remedy, there would be little to deter federal officials from violating their trust duties, at least until the allottees managed to obtain a judicial decree against future breaches of trust" (quoting *Mitchell I*, 445 U. S., at 550 (internal quotation marks omitted))).

## IV

The judgment of the Court of Appeals for the Federal Circuit is affirmed, and the case is remanded to the Court of Federal Claims for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, concurring.

I join the Court's opinion, satisfied that it is not inconsistent with the opinion I wrote for the Court in *United States v. Navajo Nation, post*, p. 488.

Both *Navajo* and the instant case are guided by *United States v. Mitchell*, 445 U. S. 535 (1980) *(Mitchell I)*, and *United States v. Mitchell*, 463 U. S. 206 (1983) *(Mitchell II)*. While *Navajo* is properly aligned with *Mitchell I*, this case is properly ranked with *Mitchell II*. *Mitchell I* and *Mitchell II*, as *Navajo* explains, instruct that "[t]o state a claim cognizable under the Indian Tucker Act . . . , a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Navajo, post*, at 506. If the Tribe satisfies that threshold, "the court must then determine whether the relevant source of substantive

law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties [the governing law] impose[s].'" *Ibid.* (quoting *Mitchell II*, 463 U. S., at 219).

In this case, the threshold set by the *Mitchell* cases is met. The 1960 Act, Pub. L. 86–392, 74 Stat. 8, provides that Fort Apache shall be "held by the United States in trust for the White Mountain Apache Tribe" and, at the same time, authorizes the Government to use and occupy the fort. *Ante*, at 469. Thus, as the Court here observes, the Act expressly and without qualification employs a term of art ("trust") commonly understood to entail certain fiduciary obligations, see *ante*, at 474–476, and "invest[s] the United States with discretionary authority to make direct use of portions of the trust corpus," *ante*, at 475; cf. *Navajo, post*, at 508 ("no provision of the [Indian Mineral Leasing Act (IMLA)] or its regulations contains *any* trust language with respect to coal leasing"). Further, as the Court describes, the Tribe tenably maintains that the Government has "availed itself of its option" to "exercis[e] daily supervision . . . [and] enjo[y] daily occupation" of the trust corpus, *ante*, at 475, but has done so in a manner irreconcilable with its caretaker obligations. The dispositive question, accordingly, is whether the 1960 measure, in placing property in trust and simultaneously providing for the Government-trustee's use and occupancy, is fairly interpreted to mandate compensation for the harm caused by maladministration of the property.

*Navajo*, in contrast, turns on the threshold question whether the IMLA and its regulations impose any concrete substantive obligations, fiduciary or otherwise, on the Government. *Navajo* answers that question in the negative. The "controversy . . . falls within *Mitchell I*'s domain," *Navajo* concludes, for "the Tribe's claim for compensation . . . does not derive from any liability-imposing provision of the IMLA or its implementing regulations." *Post*, at 493. The coal-leasing provisions of the IMLA and its allied regula-

tions, *Navajo* explains, lacked the characteristics that typify a genuine trust relationship: Those provisions assigned the Secretary of the Interior no managerial role over coal leasing; they did not even establish the "limited trust relationship" that existed under the law at issue in *Mitchell I.* See *post,* at 507–508.

In the instant case, as the Court's opinion develops, the 1960 Act in fact created a trust not fairly characterized as "bare," given the trustee's authorized use and management. The plenary control the United States exercises under the Act as sole manager and trustee, I agree, places this case within *Mitchell II*'s governance.* To the extent that the Government allowed trust property "to fall into ruin," *ante,* at 475, I further agree, a damages remedy is fairly inferable.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE KENNEDY join, dissenting.

The majority's conclusion that the Court of Federal Claims has jurisdiction over this matter finds support in neither the text of the 1960 Act, see Pub. L. 86–392, 74 Stat. 8, nor our case law. As the Court has repeatedly held, the test to determine if Congress has conferred a substantive right enforceable against the Government in a suit for money

---

*\*Mitchell I,* 445 U. S. 535 (1980), does not tug against this placement. The General Allotment Act (GAA) at issue in *Mitchell I* narrowly circumscribed its use of the term "trust" by making "the Indian allottee, and not a representative of the United States, . . . responsible for using the land for agricultural or grazing purposes." *Id.,* at 542–543. The GAA thus removed one of the "hallmarks of a more conventional fiduciary relationship." *Ante,* at 473 (citing *Navajo, post,* at 504 (the GAA "removed a standard element of a trust relationship.")). The 1960 Act, in contrast, does not modify its mandate that the United States hold the property "in trust for the White Mountain Apache Tribe," except to confirm that the Government-trustee may occupy and use the property. See *ante,* at 475 (internal quotation marks omitted). Occupation of the trust corpus by the trustee is a common feature of trusteeship, and does not itself alter the fiduciary obligations that an expressly created trust ordinarily entails. See *ante,* at 475–476.

damages is whether an Act "can fairly be *interpreted* as mandating compensation by the Federal Government for the damage sustained." *United States* v. *Testan,* 424 U. S. 392, 400 (1976) (quoting *Eastport S. S. Corp.* v. *United States,* 178 Ct. Cl. 599, 607, 372 F. 2d 1002, 1009 (1967)) (emphasis added). Instead of faithfully applying this test, however, the Court engages in a new inquiry, asking whether common-law trust principles permit a "fair inference" that money damages are available, that finds no support in existing law. *Ante,* at 473. But even under the majority's newly devised approach, there is no basis for finding that Congress intended to create anything other than a "bare trust," which we have found insufficient to confer jurisdiction on the Court of Federal Claims in *United States* v. *Mitchell,* 445 U. S. 535 (1980) *(Mitchell I).* Because the 1960 Act "can[not] fairly be interpreted as mandating compensation by the Federal Government for damage sustained" by the White Mountain Apache Tribe (Tribe), *Testan, supra,* at 400, I respectfully dissent.

## I

In *United States* v. *Testan, supra,* at 400, the Court stated that a "grant of a right of action [for money damages against the United States] must be made with specificity." Accord, *Army and Air Force Exchange Service* v. *Sheehan,* 456 U. S. 728, 739 (1982) (stating that, under the Tucker Act, "jurisdiction over respondent's complaint cannot be premised on the asserted violation of regulations that do not specifically authorize awards of money damages"). The majority agrees that the 1960 Act does not specifically authorize the award of money damages; indeed, the Act does not even "spea[k] in terms of money damages or of a money claim against the United States." *Gnotta* v. *United States,* 415 F. 2d 1271, 1278 (CA8 1969) (Blackmun, J.). Instead, the Court holds that the use of the word "trust" in the 1960 Act creates a "fair inference" that there is a cause of action for money damages in favor of the Tribe. *Ante,* at 474–475.

But the Court made clear in *Mitchell I* that the existence of a trust relationship does not itself create a claim for money damages. The General Allotment Act, the statute at issue in *Mitchell I*, expressly placed responsibility on the United States to hold lands "in trust for the sole use and benefit of the Indian . . . ." 445 U. S., at 541 (quoting 24 Stat. 389, as amended, 25 U. S. C. § 348). Despite this language, the Court concluded that the congressional intent necessary to render the United States liable for money damages was lacking. The Court reasoned that the General Allotment Act created only a "bare trust" because Congress did "not *unambiguously* provide that the United States ha[d] undertaken full fiduciary responsibilities as to the management of allotted lands."[1] 445 U. S., at 542.

The statute under review here provides no more evidence of congressional intent to authorize a suit for money damages than the General Allotment Act did in *Mitchell I*. The Tribe itself acknowledges that the 1960 Act is "silen[t]" not only with respect to money damages, but also with regard to any underlying "maintenance and protection duties" that can fairly be construed as creating a fiduciary relationship. Brief for Respondent 11; see also 249 F. 3d 1364, 1377 (CA Fed. 2001) ("It is undisputed that the 1960 Act does not explicitly define the government's obligations"). Indeed, unlike the statutes and regulations at issue in *United States* v.

---

[1] The Court of Claims has observed that the relationship between the United States and Indians is not governed by ordinary trust principles: "The general relationship between the United States and the Indian tribes is not comparable to a private trust relationship. When the source of substantive law intended and recognized only the general, or bare, trust relationship, fiduciary obligations applicable to private trustees are not imposed on the United States. Rather, the general relationship between Indian tribes and [the United States] traditionally has been understood to be in the nature of a guardian-ward relationship. A guardianship is not a trust. The duties of a trustee are more intensive than the duties of some other fiduciaries." *Cherokee Nation of Oklahoma* v. *United States*, 21 Cl. Ct. 565, 573 (1990) (citations and internal quotation marks omitted).

*Mitchell,* 463 U. S. 206 (1983) *(Mitchell II),* the 1960 Act does not "establish . . . 'comprehensive' responsibilities of the Federal Government in managing the" Fort Apache property. *Id.,* at 222. Because there is nothing in the statute that "clearly establish[es] fiduciary obligations of the Government in the management and operation of Indian lands," the 1960 Act creates only a "bare trust." *Id.,* at 226.

In addition, unlike the statutes and regulations at issue in *Mitchell I* and *Mitchell II,* "[n]othing in the 1960 Act imposes a fiduciary responsibility to manage the fort for the benefit of the Tribe and, in fact, it specifically carves the government's right to unrestricted use for the specified purposes out of the trust." 249 F. 3d, at 1384 (Mayer, C. J., dissenting); see also *id.,* at 1375 ("It is undisputed that the 1960 Act contains no . . . requirement" for the United States "to manage the trust corpus for the benefit of the beneficiaries, *i. e.,* the Native Americans"). The 1960 Act authorizes the "Secretary of the Interior to use any part of the land and improvements for administrative or school purposes for as long as they are needed for that purpose." 74 Stat. 8. The Government's use of the land does not have to inure to the benefit of the Indians. Nor is there any requirement that the United States cede control over the property now or in the future. Thus, if anything, there is less evidence of a fiduciary relationship in the 1960 Act than there was in the General Allotment Act at issue in *Mitchell I.*

If Congress intended to create a compensable trust relationship between the United States and the Tribe with respect to the Fort Apache property, it provided no indication to this effect in the text of the 1960 Act. Accordingly, I would hold that the 1960 Act created only a "bare trust" between the United States and the Tribe.

## II

In concluding otherwise, the majority gives far too much weight to the Government's factual "control" over the Fort

Apache property, which is all that distinguishes this case from *Mitchell I.* The majority holds that the United States "has obtained control at least as plenary as its authority over the timber in *Mitchell II.*" *Ante,* at 475. This analysis, however, "misconstrues . . . *Mitchell II* by focusing on the extent rather than the nature of control necessary to establish a fiduciary relationship." 46 Fed. Cl. 20, 27 (1999). The "timber management *statutes* . . . and the *regulations* promulgated thereunder," *Mitchell II,* 463 U. S., at 222 (emphasis added), are what led the Court to conclude that there was "pervasive federal control" in the "area of timber sales and timber management," *id.,* at 225, n. 29. But, until now, the Court has never held the United States liable for money damages under the Tucker Act or Indian Tucker Act based on notions of factual control that have no foundation in the actual text of the relevant statutes.

Respondent argues that *Mitchell II* raised control to talismanic significance in our Indian Tucker Act jurisprudence. To be sure, the Court did state:

> "[A] fiduciary relationship necessarily arises when the Government assumes such elaborate control over forests and properties belonging to the Indians. . . . '[W]here the Federal Government takes on or has control or supervision over tribal monies or properties . . . (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.'" *Id.,* at 225 (quoting *Navajo Tribe* v. *United States,* 224 Ct. Cl. 171, 183, 624 F. 2d 981, 987 (1980)).

However, this case does not involve the level of *"elaborate control over"* the Tribe's property that the Court found sufficient to create a compensable trust duty in *Mitchell II. Mitchell II* involved a "comprehensive" regulatory scheme that "addressed virtually every aspect of forest manage-

ment," and under which the United States assumed *"full* responsibility to manage Indian resources and land for the benefit of the Indians." 463 U. S., at 220, 222, 224 (emphasis added). Here, by contrast, there are no management duties set forth in any "fundamental document," and thus the United States has the barest degree of control over the Tribe's property. And, unlike *Mitchell II*, the bare control that *is* exercised by the United States over the property does not inure to the benefit of the Indians. *Supra*, at 484. In my view, this is more than sufficient to distinguish this case from *Mitchell II*.

Moreover, even assuming that *Mitchell II* can be read to support the proposition that mere factual control over property is sufficient to create compensable trust duties (which it cannot), the Court has never provided any guidance on the nature and scope of such duties. And, in any event, the Court has never before held that "control" alone can give rise to, as the majority puts it, the specific duty to "preserve the property." *Ante*, at 475. Indeed, had Congress wished to create such a duty, it could have done so expressly in the 1960 Act. Its failure to follow that course strongly suggests that Congress did not intend to create a compensable trust relationship between the United States and the Tribe.

In addition, the Court's focus on control has now rendered the inquiry open-ended, with questions of jurisdiction determined by murky principles of the common law of trusts,[2] and

---

[2] Even assuming the common law of trusts is relevant to determining whether a claim of money damages exists against the United States, it is well established that a trustee is not ultimately liable for the costs of upkeep and maintenance of the trust property. See Restatement (Second) of Trusts § 244 (1957) ("The trustee is entitled to indemnity out of the trust estate for expenses properly incurred by him in the administration of the trust"); 3A A. Scott & W. Fratcher, The Law of Trusts § 244, p. 325 (4th ed. 1988) ("[The trustee] is entitled to indemnity for liabilities properly incurred for the payment of taxes, for repairs, for improvements . . ."). Besides making the bald assertion that money damages "naturally follo[w]" from the existence of a trust duty, *ante*, at 476 (internal quotation

a parcel-by-parcel determination whether "portions of the property were under United States control," 249 F. 3d, at 1383. Such an approach provides little certainty to guide Congress in fashioning legislation that insulates the United States from damages for breach of trust. Instead, to the ultimate detriment of the Tribe, Congress might refrain from creating trust relationships out of apprehension that the use of the word "trust" will subject the United States to liability for money damages.

\* \* \*

The Court today fashions a new test to determine whether Congress has conferred a substantive right enforceable against the United States in a suit for money damages. In doing so, the Court radically alters the relevant inquiry from one focused on the actual fiduciary duties created by statute or regulation to one divining fiduciary duties out of the use of the word "trust" and notions of factual control. See *ante*, at 474–475. Because I find no basis for this approach in our case law or in the language of the Indian Tucker Act, I respectfully dissent.

marks omitted), the Court makes no attempt to explain how a damages remedy lies against the United States when the same remedy would not be available against a private trustee.