*930 PREGERSON, Circuit Judge,
dissenting:
I concur in the majority’s rulings on exhaustion of tribal remedies and the Administrative Procedure Act. I dissent with regard to the majority’s analysis of federal trust responsibility, and write separately on that issue.
I. Factual Background[1]
Pursuant to the goals set out in the United States Housing Act of 1937, 42 U.S.C. §§ 1437-1440, HUD developed the Homeownership Program. HUD designed the Homeownership Program to meet the housing needs of low-income American Indian families. HUD entered into agreements called “Annual Contributions Contracts” with tribal housing authorities under which HUD agreed to provide a specified amount of money to fund projects undertaken by the housing authorities and pre-approved by HUD. See 24 C.F.R. § 805.102 (1979); id. § 805.206. After securing funding from HUD, a tribal housing authority would then contract with eligible American Indian families. See id. § 805.406. The program required families to contribute land, labor, or materials to the building of their house, see id. § 805.408, and after occupying the house, each family made monthly payments in an amount calibrated to their income, see id. § 805.416(a)( 1 )(ii). The homebuyers were responsible for maintenance of the house. See id. § 805.418(a).
Until 1988, when the program was formalized in the Indian Housing Act of 1988, 42 U.S.C. §§ 1437aa-1437ee (1988), repealed by Native American Housing Assistance and Self-Determination Act of 1996, Pub.L. No. 104-330, 110 Stat. 4016 (1996), HUD operated the Homeownership Program under a series of regulations and its “Indian Housing Handbook.” See H.R.Rep. No. 100-604 (1988), reprinted in 1988 U.S.C.C.A.N. 791, 793.
In 1977, the Blackfeet Tribe established a separate entity, the Blackfeet Housing Authority, as HUD regulations required. See 24 C.F.R. § 805.109(c) (1979) (requiring, as a prerequisite to receiving Home-ownership Program funding, that tribes form a tribal housing authority). HUD published a model enabling ordinance, reprinted, in 24 C.F.R. § 805, subpt. A, app. I (1979), which the Blackfeet Tribe adopted. The enabling ordinance charged the Blackfeet Housing Authority with “[alleviating the acute shortage of decent, safe and sanitary dwellings for persons of low income” and “ [remedying unsafe and [ujnsanitary housing conditions that are injurious to the public health, safety and morals.” Blackfeet Tribal Ordinance No. 7, art. II, §§ 1-2 (Jan. 4, 1977). Thereafter, HUD granted the Housing Authority authorization and funding to build 153 homes.
Construction of the homes took place between 1979 and 1980. The homes, at least in retrospect, were not constructed well. The homes were built with wood foundations, and the wood products used to build the foundations were chemically treated with arsenic and other toxic chemicals. Plaintiffs allege, as the crux of their claim, that HUD required the use of wood foundations over the objection of tribal members, and that the Housing Authority acceded to that directive.
In the ensuing years, the foundations were, predictably, vulnerable to moisture accumulation and structural instability. Today, some of the houses are uninhabitable due to toxic mold and dried sewage residues. There has been a high incidence *931 of cancer, asthma, kidney failure, respiratory problems, and other serious health problems among residents of the homes. Many residents have been advised to leave their houses for health reasons. Some residents, however, cannot leave because there are, quite simply, no affordable housing options in the area.
Plaintiffs purchased or leased these Homeownership Program homes either directly or indirectly from the Housing Authority. They made significant monthly payments and investments of their own time and/or resources, as required under the Homeownership Program. After it became clear that the houses were substandard and hazardous, Plaintiffs sought assistance from the Blackfeet Housing Authority and from HUD in remedying the construction defects. When they received no assistance from either entity, Plaintiffs filed this class action complaint.
II. Analysis
A.
Plaintiffs allege that HUD has violated its trust responsibility to tribal members.[2] The federal government has substantial trust responsibilities toward Indians. These duties are part of the nature of the government-Indian relationship. “[A] fiduciary relationship necessarily arises when the Government assumes ... elaborate control over forests and property belonging to Indians.” United States v. Mitchell, (“Mitchell II”), 463 U.S. 206, 225, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).
1. Historical Framework
The federal government-Indian trust relationship dates back over a century. To appreciate the nature and extent of the government’s responsibilities, and its failure to discharge them, I review the history of the government-Indian trust relationship.
The United States’ relationship with the Indian tribes has almost always been “contentious and tragic.” Cobell v. Norton, 240 F.3d 1081, 1087 (D.C.Cir.2001). In the early days of this nation, the federal government sought to put an end to the communal living and nomadic life common to so many tribes. The government (by treaty and/or by force) moved Indians onto reservations. See, e.g,, Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831).
In the second half of the nineteenth century, the government replaced its policy of relocation with one of assimilation. This assimilationist policy began with treaties negotiated with individual tribes, and was eventually enacted into federal law with passage of the General Allotment Act of 1887, also known as the “Dawes Act,” eh. 119, 24 Stat. 388 (as amended at 25 U.S.C. § 331 et seq.). Under the General Allotment Act, beneficial title of the lands allotted to tribes vested in the United States as trustee for individual Indians.[3]
The government then began to divide reservations and other Indian lands into individual parcels. The government essentially took the land it had earlier set aside for Indian tribes and re-allotted the land *932 to individual tribe members. See Felix S. Cohen, Handbook of Federal Indian Law § 1.04 (2005 ed.). “The objectives of allotment were simple and clear cut: to extinguish tribal sovereignty, erase reservation boundaries, and force assimilation of Indians into the society at large.” Yakima v. Yakima Indian Nation, 502 U.S. 251, 254, 112 S.Ct. 683, 116 L.Ed.2d 687 (1992). Once tribal lands were allotted in fee to individual tribal members, white settlers could purchase the lands from tribe members.
The federal government ceased allotting tribal lands to individuals with the enactment of the Indian Reorganization Act of 1934 (“IRA”), 48 Stat. 984 (codified as amended at 25 U.S.C. § 461 et seq.). Lands already allotted remained so, but the IRA provided that unallotted Indian lands would be returned to tribal ownership. 25 U.S.C. § 463.
In the 1950s, federal Indian policy shifted yet again as Congress adopted a “termination policy.” Under termination, Congress sought to release tribes from federal supervision and to terminate the government-Indian relationship. The purpose of this policy shift was specifically to sever the trust relationship. Cobell, 240 F.3d at 1088. During this period, Congress terminated numbers of tribes and withdrew its recognition of those tribes.
The termination policy was no more successful than earlier assimilation efforts, and was soon replaced with the current policy of self-determination and self-governance. In 1975 Congress enacted the Indian Self-Determination and Education Assistance Act, Pub.L. No. 93-638, 88 Stat. 2203 (1975). Today, much tribally owned land is held in trust “indefinitely.” 25 U.S.C. § 462.
2. The Mitchell Doctrine
Here, Plaintiffs argue that, as tribal members, HUD owed them a trust duty and it breached that duty. Claims based on the tribal trust duty are enforceable via the Tucker Act. In 1980, the Supreme Court held that the General Allotment Act, on its own, did not provide a substantive damage remedy enforceable through the Tucker Act. United States v. Mitchell (Mitchell I), 445 U.S. 535, 541-46, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980).
The tribe in Mitchell I protested federal mismanagement of its timber resources. Although acknowledging that the General Allotment Act did indeed establish a trust relationship on behalf of the Indians, the Court found the relationship to be a “limited” one that did not impose a duty to manage timber resources. Id. at 542, 100 S.Ct. 1349. Under the Court’s reading of the General Allotment Act, the trust responsibilities of the federal government under the statute were merely to prevent alienation of the land and to hold the land “immune from ... state taxation.” Id. at 544, 100 S.Ct. 1349.
Although the Mitchell I Court rejected the tribe’s claim as premised solely on the General Allotment Act, it remanded to the Court of Claims for consideration of whether other statutes might provide a basis for liability. Id. at 546, 100 S.Ct. 1349. Thus, the Court left the door open to continued pursuit of the claim against the federal government under alternative sources of law.
When the case returned to it, the Supreme Court permitted the Tucker Act suit to proceed. Mitchell II, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580. The Court examined various timber management statutes enacted subsequent to the General Allotment Act, which directed the government to manage Indian forest resources, obtain revenue thereby, and pay proceeds to the landowners. Id. at 219-24, 103 S.Ct. 2961. The Court held that these statutes imposed strict duties upon the *933 government to manage forestlands and specifically required the government to take into account the maintenance of the productive use of the land, the highest and best use of the land, and the financial needs of the owner and the owner’s heirs. Id. The Court held that the statutes confirmed the existence of a fiduciary relationship, especially given the pervasive and complete control exercised by the government over these lands. Id..
Finally, in Mitchell II the Court concluded that because this fiduciary relationship specifically prescribed management of Indian timber resources, these statutes could fairly be interpreted as mandating the payment of money—thereby satisfying the standard for a Tucker Act action. Id. at 224-27, 103 S.Ct. 2961. Moreover, the Court stated, absent a damages remedy, the fiduciary obligations of the United States would be largely unenforceable, because prospective relief would be inadequate and fail to deter federal officials from defaulting in their trust duties. Id. at 227-28, 108 S.Ct. 2961.
Together, Mitchell I and II form the Mitchell doctrine, which outlines the circumstances under which the federal government owes a fiduciary duty to tribes. These cases indicate that the government’s obligation must go beyond the mere general obligation that it owes to domestic dependent sovereigns. A tribe must demonstrate specific statutory language indicating that the federal government has pervasive control over the resource at issue. Two decisions from 2003 clarify the Mitchell doctrine: United States v. Navajo Nation, 537 U.S. 488, 123 S.Ct. 1079, 155 L.Ed.2d 60 (2003), and United States v. White Mountain Apache Tribe, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003).
In 1964, the Navajo Nation, with the approval of the Secretary of the Interior, entered into a lease with the corporate predecessor of the Peabody Coal Company for coal mining on tribal lands. Navajo Nation v. United States, 46 Fed.Cl. 217, 221 (Ct.Cl.2000). The lease provided for low initial royalty payments to the tribe. Id. Pursuant to the terms of the lease, the tribe and the mining company agreed to delegate power to the Secretary of the Interior to adjust the royalty rate to a “reasonable” level on the twentieth anniversary of the lease. Id. By the 1980s, the royalty payments to the Navajo Nation were only about two percent of gross proceeds on the coal, well below the twelve- and-a-half percent Congress had established for coal mined on federal lands. Navajo Nation, 537 U.S. at 496, 123 S.Ct. 1079.
Subsequently, the Navajo Nation and the Peabody Mining Company negotiated a change in the royalty rate to twelve-and-a-half percent, retroactive to 1984, and included other concessions such as coal company acceptance of tribal taxation of coal production. Id. at 498, 123 S.Ct. 1079. In 1987, after the Navajo Tribal Council approved the lease amendments and a final agreement was signed, Interior Secretary Hodel approved the negotiated agreement. Id. at 500, 123 S.Ct. 1079. The tribe later learned that Secretary Hodel had engaged in backroom ex parte dealings with the coal company, without which the royalty rate would likely have been closer to twenty percent (not the twelve-and-a-half percent negotiated).
In 1993, the Navajo Nation filed suit in the Court of Federal Claims under both the Tucker Act and the Indian Tucker Act, claiming that the Secretary of the Interior breached the government’s trust obligations by approving the 1987 amendments to the lease. Navajo Nation, 46 Fed.Cl. at 220-21. The tribe contended that the Indian Mineral Leasing Act imposed a fiduciary obligation on the Secre *934 tary of the Interior to maximize the financial returns from coal leases and that the twelve-and-a-half percent royalty rate approved in 1987 was manifestly inadequate. Id. at 219-21.
In Navajo Nation, the Supreme Court confirmed the continued primacy of Mitchell I and Mitchell II as “the pathmarking precedents on the question whether a statute or regulation (or combination thereof) ‘can fairly be interpreted as mandating compensation by the Federal Government.’ ” 587 U.S. at 503, 123 S.Ct. 1079 (quoting Mitchell II, 463 U.S. at 218, 103 S.Ct. 2961). The Court explained the contrast between Mitchell I and Mitchell II as that between a “bare trust” for limited purposes and “full responsibility” by the government for management of Indian resources. Id. at 505, 123 S.Ct. 1079 (quoting Mitchell II, 463 U.S. at 224, 103 S.Ct. 2961). The Court held that the statutory “analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions.” Id. at 506, 123 S.Ct. 1079. However, once such a full fiduciary duty has been identified in the pertinent statute, the Court said that the availability of damages as a remedy “may be inferred,” even if not expressly referred to in the statute. Id.
Turning to the Indian Mineral Leasing Act, the Na:vajo Nation Court ruled, “[t]he IMLA simply requires Secretarial approval before coal mining leases negotiated between Tribes and third parties become effective and [further] authorizes the Secretary generally to promulgate regulations governing mining operations.” Id. at 507, 123 S.Ct. 1079. The statute, by failing to include a federal managerial role, did not establish the “limited trust relationship” needed to support a claim for relief. Id. at 507-08, 123 S.Ct. 1079.
Further, the Court explained that “imposing fiduciary duties on the Government here would be out of line with one of the statute’s principal purposes.” Id. at 508, 123 S.Ct. 1079. Because “[t]he IMLA aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties,” the congressional purpose would be defeated by “[ijmposing upon the Government a fiduciary duty to oversee the management of allotted lands.” Id.
In an opinion issued the same day as Navajo Nation, the Supreme Court examined the trust doctrine in the context of overseeing the maintenance of buildings on land of the White Mountain Apache Tribe. United States v. White Mountain Apache Tribe, 537 U.S. 465, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003).
In 1870, the United States Army established Fort Apache in the White Mountains of east-central Arizona. White Mountain Apache Tribe v. United States, 46 Fed.Cl. 20, 22 (1999). In the 1920s, control of the fort was transferred to the Department of the Interior, and part of the property was used as a school. Id. In 1960, Congress declared that Fort Apache “be held by the United States in trust for the White Mountain Apache Tribe, subject to the right of the Secretary of the Interi- or to use any part of the land and improvements for administrative or school purposes for as long as they are needed for that purpose.” Pub.L. No. 86-392, 74 Stat. 8, 8 (1960). In 1976, the National Park Service designated Fort Apache as a National Historic Site. White Mountain Apache Tribe, 46 Fed.Cl. at 22.
As alleged by the tribe, the Secretary of the Interior exercised the statutory prerogative to use the property, but then allowed Fort Apache to fall into disrepair and failed to perform necessary maintenance. Id. The tribe commissioned an engineering assessment of the property. The assessment reported that it would cost roughly $14 million to rehabilitate the *935 property in accordance with standards for historic preservation. White Mountain Apache Tribe, 537 US. at 469, 123 S.Ct. 1126. The tribe brought suit in the Court of Claims arguing that the government had breached its fiduciary duty.
The Supreme Court held there to be an actionable fiduciary relationship. Id. at 468, 123 S.Ct. 1126. In light of the Mitchell cases, the Court concluded that the Fort Apache trust statute “goes beyond a bare trust and permits a fair inference that the Government is subject to duties as a trustee and liable in damages for breach.” Id. at 474, 123 S.Ct. 1126. First, the 1960 Act “expressly defines a fiduciary relationship” by providing that Fort Apache be “held by the United States in trust for the White Mountain Apache Tribe.” Id. (citing statute). Second, the United States exercised its discretionary authority to make actual use of the property, thus “not merely exercising] daily supervision but ... enjoy[ing] daily occupation.” Id. at 475, 123 S.Ct. 1126.
Accordingly, the Court held when the government assumes plenary control over assets held in trust, the government likewise assumes an obligation as trustee to preserve those assets, even absent express statutory delineation of duties of management and conservation. Id. As the Court observed, “elementary trust law, after all, confirms the commonsense assumption that a fiduciary actually administering trust property may not allow it to fall into ruin on his watch.” Id. The Court explained that a trust relationship between the United States and Native Americans alone is not enough to imply a remedy in damages, and thus “a further source of law [is] needed to provide focus for the trust relationship.” Id. at 477, 123 S.Ct. 1126. But “once that focus [is] provided, general trust law [is to be] considered in drawing the inference that Congress intended damages to remedy a breach of obligation.” Id.
The Mitchell cases, Navajo Nation, and White Mountain Apache together define the state of law with respect to the Indian trust doctrine. These cases stand for the proposition that tribes may successfully bring cases before the Court of Federal Claims seeking money damages based on the government’s breach of a fiduciary duty. Hence, the trust doctrine gives rise to a viable Tucker Act claim. See George C. Sisk, Yesterday and Today: Of Indians, Breach of Trust, Money and Sovereign Immunity 29 Tulsa L.Rev. 313, 317 (2003) (summarizing these important cases and discussing their interplay with the Tucker Act and the Indian Tucker Act).
Before the Court, decided these cases, tribes and tribal members had to identify specific statutes stating a right to monetary relief from the government. Id. at 337. With these four cases, the Court has clarified that the trust relationship itself can establish a right to monetary relief. However, plaintiffs must go beyond asserting the general trust relationship between tribes and the government, and must allege a specific trust obligation tied to the resource at stake. In Mitchell II, the Court recognized that statutes established a pervasive federal regulation over timber resources adequate to demonstrate a trust relationship. In White Mountain Apache, the Court held that the federal government’s occupation and management of land and buildings established a trust relationship. These cases demonstrate that where statutes and behavior create pervasive governmental control over a tribal resource, a specific trust relationship and concomitant fiduciary duty are created.
In Navajo Nation, the Court examined the Interior Department’s control over mining resources and found no pervasive control. There, the Court held that the *936 statutory framework only established a minor role for the federal government—signing and approving mining leases that were negotiated and managed by the tribes. The Court found it particularly significant that the statute regarding the leases was designed to keep control of the resource in the hands of the tribe. In the wake of these cases, determining whether there is a trust relationship sufficiently detailed to create a viable claim under the Tucker Act requires a tailored inquiry into the resource at stake, the role of the federal agency involved, and the attendant statutory structure.
3. Housing on the Blackfeet Reservation
In assessing whether plaintiffs have a potential claim under the tribal trust doctrine, we examine the level of control the federal government exercises over the tribal asset at issue. Here, the asset is housing. The federal government’s pervasive control of housing on the Blackfeet reservation relates directly to the trust obligations the government owed the tribe.
Congress’s decision to hold tribal land in trust has the practical result of eliminating the private housing market on tribal land because neither individual members of the tribe nor the tribe itself has an ownership interest that can be used as security. The government’s decision to hold tribal land in trust shows Congress’ intent to maintain pervasive control over the resource at stake and gives rise to a fiduciary duty in the government-created tribal housing market. However admirable the government’s motivations, the decision to take tribal land in trust has had adverse consequences: by holding tribal land in trust and preventing alienation, the federal government foreclosed many options that exist in most private housing markets. In a recent publication, the United States Commission on Civil Rights reported that American Indians have consistently found it difficult to obtain mortgages on their land because the land is held in trust and therefore cannot be used as collateral. See United States Comm, on Civil Rights, A Quiet Crisis: Federal Funding and Unmet Needs in Indian Country at 64, available at http://www.usccr.gov/pubs/na0703/ na0731.pdf; see also H.R. Rep. 100-604, reprinted in 1988 U.S.C.C.A.N. 791, 795.
Similarly, private housing developers have been deterred from entering tribal housing markets because the property cannot be alienated. Id. at 64. The federal government exercises pervasive control over tribal land, and in so doing, severely limits the tribe’s ability to control its own economic development in the area of housing. In fact, according to one House Report relating to the passage of the Indian Housing Act, HUD’s Homeownership Program was the “only reasonable source of housing in many reservations,” see H.R. Rep. 100-604, reprinted in 1988 U.S.C.C.A.N. 791, 795, in part because the land was held in trust.
Thus, while the goal of the General Allotment Act was to prevent unwise tribal alienation of the land, the result was to prevent building and improving housing. Restrictions operating on Indian lands prevent developers from entering the private tribal housing market, and leave tribes with no option but to wait for the federal government to provide decent, safe, and sanitary housing.
The government has often undertaken to provide tribal housing as an exercise of its special responsibility to the tribes. Congress has acknowledged federal control over tribal land and the government’s attendant obligations. Congress has specifically noted that the federal government’s general trust relationship with the tribes creates a responsibility for the federal government to remedy the deplorable housing conditions on reservations. See *937 Native American Housing Assistance and Self-Determination Act (“NAHASDA”), 25 U.S.C. § 4101(2)-(5). NAHASDA recognizes that:
Congress, through treaties, statutes, and the general course of dealing with Indian tribes, has assumed a trust responsibility for the protection and preservation of Indian tribes and for working with tribes and their members to improve their housing conditions and socioeconomic status so that they are able to take greater responsibility for their own economic condition; ... [Moreover,] providing affordable homes in safe and healthy environments is an essential element in the special role of the Un ited States in helping tribes and their members to improve their housing conditions and socioeconomic status.
25 U.S.C. § 4101(4)-(5) (emphasis added).
As indicated in the findings under NA-HASDA, the federal government’s duty to remedy tribal housing conditions existed even before NAHASDA—it derives from treaties and the “general course of dealing” with tribes. During the process of forcing the tribes onto reservations, many tribes were explicitly promised housing in exchange for land cession. See Virginia Davis, A Discovery of So rts: Reexamining the Origins of the Federal Indian Housing Obligation, 18 Harv. BlackLetter L.J. 211, 215-23 (2002). Others were promised money to “promote their civilization.” Id. at 218-19; see, e.g., White Mountain Apache Tribe v. United States, 26 Cl.Ct. 446, 465, 466-67 (1992). The Blackfeet Tribe signed such a treaty. The Court of Claims has held that treaty language such as the “requisites to ‘promote civilization’ ” includes housing. White Mountain Apache, 26 Cl.Ct. at 466-67. Treaty language and the relationship between the tribes and the federal government demonstrate that the federal government has long promised that it would assist American Indian tribes in providing housing.
When tribal land was taken into trust under the General Allotment Act, it was done to ensure that every Indian could have a “homestead of his own with assistance by the government to build houses and fences, and open farms.” See Davis, 18 Harv. BlackLetter L.J. at 224 (quoting Comm’r of Indian Affairs, Annual Report iv-v (1885)). Henry Dawes, proponent of the General Allotment Act, stated that housing was a central element of the Act. Id. at 224. When the government took the land in trust, it committed itself to play a major role in housing the trust land’s occupants.
Navajo Nation and White Mountain Apache delineate the ends of a continuum along which courts examine the Mitchell doctrine. In White Mountain Apache, the federal government’s involvement was pervasive. The federal government occupied the land, built and maintained structures on the land, and managed the land. Additionally, federal legislation explicitly recognized a trust relationship between the government and the tribe with respect to management of the land. When the federal agency allowed the buildings on the land to fall into dangerous disrepair, the Court held that it had a fiduciary obligation regarding the buildings and the land. The obligations surrounding the buildings had also been heightened by the National Park Service’s designation of the area as a National Historic Site. Thus, the case demonstrates on-site involvement, oversight of the building and management of the structure, funding, and a statutory framework explicitly recognizing the trust relationship.
The present case is similar in several respects. The federal government controlled the design of the houses, set the building standards, approved all the designs and contracts, and provided funding. HUD’s control of housing on tribal land *938 and the Homeownership Program was pervasive.
HUD set the “prototype costs” for each locality, and required that the cost of construction and equipment could not exceed the prototype cost by more than ten percent. See Department of Housing and Urban Development, Manual 7440.1: Indian Housing Handbook 3-29 (March 1976). These prototype costs were based on the minimum property standards, standards that permitted the use of the wood foundations at issue here. Housing authorities proposed projects within the prototype cost, “carefully considering] costs ... to be sure that the project is completed at the lowest possible cost.” Indian Housing Handbook 3-40. Even then, however, HUD approved the “development cost” allocated for each project. Indian Housing Handbook 3-40; 5-25. Any variation from the minimum property standards had to be HUD-approved. Indian Housing Handbook 5-25. HUD also had final say over design of the houses and the authority to alter tribally proposed designs in any way. The Indian Housing Handbook has a sample of every form, every contract, every checklist to be used from the first step to the last.
Thus, the only autonomy permitted to tribal housing authorities was the right to design a home within the price range set by HUD, a price range based on HUD’s minimum property standards. Even then HUD could change the plans. This is hardly “maximum responsibility for project administration” promised to the Housing Authority by HUD. See HUD Housing Manual 2-1.
The facts of this case confirm that the tribe had little control over how HUD housing would be built. Although the Blackfeet Housing Authority and occupants of the housing vigorously opposed use of wood foundations, it appears that they had no power to control the materials used. Thus, not only was HUD funding the only viable lending option on most tribal property, but it exerted almost total control over how the tribes would use the housing money they received to construct homes on land the government held in trust.
Thus, as with Mitchell II, there is pervasive management of a tribally owned resource to the exclusion of control by the tribal landholders. And, unlike Mitchell I, the very purpose for which the land was taken in trust—to prevent alienation— caused the injury at issue. Just as in Mitchell II, tribes were squeezed out of any role in their own tribal housing market.
The current case contrasts with the minimal federal control at issue in Navajo Nation. There, the Interior Department’s only role was to approve leases. It did not manage the leases, negotiate the leases, or dictate their terms. The Interior Department did not provide any funding or oversight beyond lease approval. Although the Interior Secretary appeared to have conducted himself improperly by revealing confidential information to the mineral lessee, the Court held that there was no fiduciary duty and no trust asset in connection with the mineral leases. Navajo Nation represents minimal involvement, and it stands in sharp contrast to the pervasive regulation of housing on the Blackfeet reservation. The framework in this case is more akin to the system in White Mountain Apache.
An important element in both Navajo Nation and White Mountain Apache (and in the Mitchell cases) was the statutory framework regarding the resource in question. In White Mountain Apache, statutory language used the word “trust” when acknowledging the obligation the government owed the tribe in relation to management of tribal land. In Navajo Nation, *939 the statutory framework gave the tribe management of the resource. In Mitchell II, the Court examined several timber management statutes and noted that the statutory framework showed evidence of an intent by the federal government to pervasively control the tribe’s timber resources. Based on the importance of statutory framework in a tribal trust analysis, the determining factor in the present analysis lies in the housing statutes that resulted in the construction of the substandard homes.
The homeowners base their trust claims on five statutes: the United States Housing Act of 1937 and 1949, 42 U.S.C. § 1437-1437x; the National Housing Act, 12 U.S.C. §§ 17151(a), 1738(a); the Indian Housing Act of 1988, 42 U.S.C. § 1437aa-ff; and the Native American Housing and Self-Determination Act of 1996 (“NAHAS-DA”), 25 U.S.C. §§ 1702-1750.
At the time the houses were constructed for low-income families on the Blackfeet Indian Reservation in the 1970s, there was no specific statutory enactment applicable only to public housing on Indian lands. Federal low-income housing legislation was generally found in the U.S. Housing Act. See 42 U.S.C. §§ 1437-1437J (1976). The provisions in the U.S. Housing Act applied to all public housing, including housing on Indian reservations. See 42 U.S.C. § 1437a(6)-(7) (1976) (defining “public housing agency” to include entities “authorized” by, among other governmental agencies, “Indian tribes” to “engage in or assist in the development or operation of low-income housing”).
Through the Housing Act, Congress appropriated money for low-income housing pui'poses, see 42 U.S.C. § 1437g(c), and authorized and directed the Secretary of HUD to award, or lend, any appropriated funds to eligible grantees, see 42 U.S.C. §§ 1437b, 1437c, 1437f, 1437g(a), & 1439(d). Local housing authorities could apply for loans and grants for the “development, acquisition, or operation of low-income housing projects.” See 42 U.S.C. §§ 1437b, 1437c, 1437d(a), 1437g. Under the Housing Act, HUD could award funding and other benefits to tribal housing authorities. See, e.g., 24 C.F.R. §§ 805.108-805.109 (1976) (relating to Indian housing authorities).
HUD implemented, by regulation, a “Mutual Help Homeownership Opportunity Program” on Indian lands to help meet the needs of low-income Indian families. The homes currently at issue were built under this regulatory program. Housing authorities could sell public housing to low-income families under “such terms and conditions as[HUD] may determine by regulation.” 42 U.S.C. § 1437c(h) (1976). Under the Homeownership Program, an Indian housing authority could apply to HUD for loans to enable the housing authority to develop public housing designed for sale to eligible tribal members. See 24 C.F.R. §§ 805.404(a), 805.415, 805.416, 805.421, 805.422 (1976).
In 1988, nearly ten years after the Blackfeet low-income homes were completed, Congress enacted the Indian Housing Act. The Indian Housing Act was specific Indian housing legislation that moved all Indian public housing programs to a separate title of the U.S. Housing Act and provided express statutory authority for the Homeownership Program under 42 U.S.C. § 1437bb (1988). With the subsequent adoption of the NAHASDA in 1996, Congress moved Indian housing .programs out of the U.S. Housing Act consolidating the programs under NAHASDA. HUD’s involvement with Indian public housing programs is. now controlled exclusively by the NAHASDA and its implementing regulations. Housing Authorities receive block grants under the NAHASDA, and HUD administers the grants. See Solo *940 mon v. Interior Reg'l Hous. Auth., 313 F.3d 1194, 1195 (2002),
On their face, these statutes only establish a meehanism for lending money to tribal housing authorities. However, a review of the statutory framework and the Homeownership Program reveals a much more pervasive and controlling framework, as detailed above. The Homeownership Program details the requirements for the housing and connected contracts. There is no language indicating that the goal of the Homeownership Program is merely to help Indian tribes in managing their land and resources. The regulations do not defer to tribal authorities or tribal decision making, but instead explicitly detail what the tribal authorities are to do each step of the way. Federal control over the funds and the program is pervasive.
But pervasive control over a tribal housing program is not necessarily the same as federal control over the tribal resource. If the tribe chooses not to participate in this program (and therefore not receive the funding for housing), HUD has no input into the housing contracts, house designs, or materials used. Such a view, however, ignores the overarching housing issue. The federal government undertook, as part of its treaty and general trust relationship, to assist the Blackfeet tribe to acquire decent, safe, and sanitary housing for low-income families. The tribe had little choice but to accept the government housing program. HUD’s Homeownership Program was the “only reasonable source of housing in many reservations,” see H.R. Rep. 100-604, reprinted in 1988 U.S.C.C.A.N. 791, 795, and this was the case on the Blackfeet Reservation. Here, the federal government actively undertook to assist the Blackfeet to obtain desperately needed decent, safe, and sanitary housing. Labeling the housing program as simply one of “financing” ignores the fact that private lenders would not finance the construction of homes on reservation land held by the federal government, which actively undertook to assist the Blackfeet to obtain desperately needed decent, safe, and sanitary housing.
Because the government undertook to fulfill its trust responsibility to provide housing for the tribe and did so through a pervasive regulatory structure, I would hold that the federal government, having undertaken this task, had an obligation to perform it in a manner consistent with its fiduciary duty to the tribe. Based on the facts set forth in the Complaint, I believe that the government breached that duty by requiring the tribes to use substandard, hazardous building materials during the construction of the homes and then refusing to repair or rebuild the homes. Accordingly, I concur in part, dissent in part.

. These facts, except as noted, are taken from Plaintiffs’ complaint, which is presumed true for purposes of this Rule 12(b)(6) proceeding.

. Count Three of Plaintiffs’ original complaint alleged that HUD has violated: (a) the United States Housing Act of 1937, 42 U.S.C. §§ 1437-1437x; (b) the Indian Housing Act, 42 U.S.C. §§ I437aa-1437ee; (c) the Native American Housing Assistance and Self-Determination Act of 1996, 25 U.S.C. §§ 4101-4243; and (d) the Housing Act of 1949, 42 U.S.C. §§ 1441-1490. On appeal, Plaintiffs did not challenge the district court's holding that no express or implied right of action existed under those statutes. Accordingly, I do not consider those statutes here.

. Where tribes resisted allotment, it could be imposed. See Act of June 28, 1898, ch. 517, 30 Stat. 495 (“Curtis Act”).