# United States Court of Appeals for the Federal Circuit

---

**MARK ROBERTS,**
*Plaintiff-Appellant,*

v.

**UNITED STATES,**
*Defendant-Cross-Appellant.*

---

2012-5113, -5114

---

Appeals from the United States Court of Federal Claims in No. 10-CV-0754, Senior Judge Eric G. Bruggink.

---

Decided: February 10, 2014

---

DANIELLE B. OBIORAH, Employment Rights Law Firm of Danielle Obiorah, PC, of McDonough, Georgia, argued for plaintiff-appellant.

STEVEN J. GILLINGHAM, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-cross-appellant. On the brief were STUART F. DELERY, Principal Deputy Assistant Attorney General, JEANNE E. DAVIDSON, Director, and K. ELIZABETH WITWER, Trial Attorney. Of counsel on the brief was FREDERICK A.

CONGDON, Pacific Area Counsel Office, United States Marine Corps, of Okinawa, Japan.

———————————

Before DYK, O'MALLEY, and WALLACH, *Circuit Judges.*

DYK, *Circuit Judge.*

Plaintiff Mark Roberts appeals a decision of the United States Court of Federal Claims granting defendant United States' motion for summary judgment on his claim for living quarters allowance ("LQA"). The United States cross-appeals from the trial court's order denying its motion to dismiss for lack of subject-matter jurisdiction.[1] We conclude that the trial court's exercise of jurisdiction over Roberts' claim was appropriate, and we affirm the grant of summary judgment in the United States' favor.

## BACKGROUND

Roberts asserts that he is owed LQA in connection with his current civilian position as Deputy Camp Commander ("DCC") for Camp Hansen, a Marine Corps base in Okinawa, Japan. LQA is a payment given to civilian employees for the annual cost of suitable housing for the employees and their families. As discussed below, payment of LQA is authorized for particular classes of employees by the Overseas Differentials and Allowance Act

———————————

[1] Because the United States' cross-appeal simply sought affirmance of the dismissal on different grounds, *i.e.*, lack of subject-matter jurisdiction, this cross-appeal does not seek to reverse or modify the trial court's judgment and is improper. *Bailey v. Dart Container Corp. v. Michigan*, 292 F.3d 1360, 1362 (Fed. Cir. 2002). We treat the United States' arguments in support of its cross-appeal as an alternate ground for affirming the trial court judgment.

("Act"), 5 U.S.C. § 5921 *et seq.*, and implementing regulations issued by the Department of State (the Department of State Standardized Regulations or "DSSR"). Further implementing regulations—the Department of Defense ("DoD") Civilian Personnel Management Instruction No. 1400.25, Vol. 1250 ("*Instruction*") and the Marine Corps Bases Japan ("MCBJ") Order P12000.2A ("*Order*") issued by the Commander of the MCBJ—generally limit LQA to situations in which the appointing officer has designated the position as LQA-eligible based on recruitment need and expense to the agency.

When deciding whether to offer LQA for the DCC position at Camp Hansen pursuant to the *Instruction* and the *Order*, the deputy commanding general of the MCBJ considered both the recruitment need and the expense to the agency. The deputy commanding general's prior experience showed that there were many qualified, locally-available candidates for the various DCC positions for whom LQA was not needed as a recruitment incentive. Indeed, it was known that many active-duty Marines like Roberts wished to remain in Okinawa in civilian positions after retirement. The deputy commanding general also determined that there were insufficient funds to support LQA for DCC positions in Okinawa without reallocating funds from other programs. After considering both recruitment need and expense, the deputy commanding general determined that LQA was not necessary for these DCC positions. In April 2008, the Marine Corps posted Job Announcement number OK-08-058 ("*Job Announcement*"), which listed a job vacancy for "Deputy Camp Commander for Camp Operations" at Camp Hansen. J.A. 163. The hiring process confirmed the lack of recruitment need determination when fourteen qualified, locally-available candidates responded to the *Job Announcement*.

The *Job Announcement* noted that "[t]his position *does not incur overseas allowances*. Payment of travel and

transportation expenses is not authorized. However, anyone on a transportation agreement with LQA entitlements may be granted continuance." J.A. 165 (emphasis added). Subsequently, Roberts applied for and was appointed to the DCC position at Camp Hansen upon conclusion of his active duty service with the Marine Corps in Okinawa, Japan. When he was offered the position, Roberts was again informed that his salary would be "$57,146 with no LQA." J.A. 491.

Roberts accepted the DCC position. Thereafter, he requested a continuance of LQA. The Marine Corps determined that, since the DCC position was Roberts' first civilian appointment, he was not currently receiving LQA and was ineligible for LQA under a continuance theory. In July 2009, after the denial of his LQA request, Roberts appealed to the Office of Personnel Management ("OPM"), which is authorized to decide the issue of employee allowances.[2] In March 2010, OPM denied Roberts' claim, explaining that the decision not to offer LQA was "consistent with stated policy [and] regulatory guidance," J.A. 526, and "it was made clear that the salary would be $57,146 with no LQA." J.A. 522.

On November 3, 2010, Roberts filed a complaint in the Court of Federal Claims ("Claims Court") seeking damages, and alleging that the Marine Corps improperly denied him an award of LQA under the Act and its implementing regulations. The Claims Court rejected the government's argument that it lacked jurisdiction, but granted sum-

---

[2]    *See* Legislative Branch Appropriations Act, Pub. L. No. 104-53, 109 Stat. 514, 535 (1995) (transferring claims settlement authority to the Office of Management and Budget ("OMB")); 5 C.F.R. § 178.101 (OMB delegating authority to OPM to settle claims against the United States).

mary judgment for the government on the merits. Both parties appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3). We review de novo the jurisdictional issue and the Claims Court's grant of summary judgment. *Cambridge v. United States*, 558 F.3d 1331, 1335 (Fed. Cir. 2009).

## DISCUSSION

## I. Jurisdiction

The United States argues that the Claims Court should have dismissed on subject-matter jurisdiction grounds. The Tucker Act provides that the Claims Court

> shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1).

In previous cases, the Supreme Court and we have addressed the standard for determining whether jurisdiction exists under the Tucker Act with respect to a claim for money under a statute and regulations. For jurisdiction to exist, the statute and regulations must be such that they "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (quoting *United States v. Testan*, 424 U.S. 392, 400 (1976)). It is enough "that a statute creating a Tucker Act right be reasonably amenable to the reading that it mandates a right of recovery in damages." *Id.* at 473. Further, the statute and regulations must be money-mandating as to the class of which plaintiff claims to be a member. *Casa de Cambio Comdiv*

*S.A. de C.V. v. United States*, 291 F.3d 1356, 1361 (Fed. Cir. 2002) (holding that, even if "[the regulations] were money-mandating as to [third party]," they "are not money-mandating as to [plaintiff] since there is no indication that they were designed to convey rights to [members of plaintiff's class]"). The United States' main argument is that the Act and its implementing regulations are discretionary, and therefore, are not money-mandating, as required for Tucker Act jurisdiction. *See Testan*, 424 U.S. at 398; *Fisher v. United States*, 402 F.3d 1167, 1171–72 (Fed. Cir. 2005) (en banc).

Roberts argues that the Claims Court's exercise of jurisdiction over his claim was proper under two separate theories. First, Roberts alleges that the statute and the DSSR, standing alone, entitle him to LQA, relying on *Trifunovich v. United States*, 196 Ct. Cl. 301 (1971). Second, in the alternative, he argues that he is entitled to LQA under a combination of the statute, the DSSR, the further implementing regulations, and the *Job Announcement*.

A. Roberts' First Argument in Support of Jurisdiction

Under his first theory, Roberts argues that the Act and the DSSR, standing alone, confer the right to LQA, and that he satisfies the requirements of those provisions. We disagree. The Act and the DSSR, standing alone, are only money-authorizing, not money-mandating.

The Act sets forth general requirements for awarding LQA:

> (a) When Government owned or rented quarters are not provided without charge for an employee in a foreign area, one or more of the following quarters allowances *may be granted* when applicable:
>
>          . . .

> (2) A living quarters allowance for rent, heat, light, fuel, gas, electricity, and water . . . .

5 U.S.C. § 5923(a) (emphasis added). The Act also delegated the authority to promulgate requirements for LQA to the President, stating that:

> (c) The allowances and differentials authorized by this subchapter shall be paid under regulations prescribed by the President . . . .

*Id*. § 5922(c). The President has delegated authority to promulgate regulations to the Secretary of State. *See* Executive Order 10903, January 9, 1961, 26 Fed. Reg. 217-03, 217-18. Under this authority, the Secretary of State promulgated the DSSR, setting forth additional requirements for LQA:

> Quarters allowances prescribed in Chapter 100 *may be granted* to employees recruited outside the United States, provided that:
>
>> a. the employee's actual place of residence in the place to which the quarters allowance applies at the time of receipt thereof shall be fairly attributable to his/her employment by the United States Government; and
>>
>> b. prior to appointment, the employee was recruited in the United States, the Commonwealth of Puerto Rico, the Commonwealth of the Northern Mariana Islands, the former Canal Zone, or a possession of the United States, by [various foreign and domestic governmental authorities, organizations, and firms] and had been in substantially continuous employment by such employer under conditions which provided

>for his/her return transportation to the
>United States [or various U.S. territories];
>or
>
>c. as a condition of employment by a Gov-
>ernment agency, the employee was re-
>quired by that agency to move to another
>area, in cases specifically authorized by
>the head of an agency.

DSSR § 031.12 (J.A. 307) (emphasis added). Roberts argues that the statute and the DSSR require the grant of LQA when the stated criteria are satisfied. The government argues that the "may be granted" language in both the statute and regulations requires that the provisions be interpreted as an authorization, not as a mandate.

We have struggled with the question of when a statute or regulation using the word "may" is money-mandating. Our predecessor court, the Court of Claims, has held that "a statute providing for solely discretionary payment of money does not give rise to 'a right to recover money damages from the United States.'" *Adair v. United States*, 648 F.2d 1318, 1327 (Ct. Cl. 1981) (quoting *Testan*, 424 U.S. at 398). In *McBryde v. United States*, we further explained that "[w]e . . . presume that when Congress used the word 'may' in [a] statute . . . , we should use common sense and presume that the word conveys some degree of discretion." 299 F.3d 1357, 1362 (Fed. Cir. 2002). This presumption may be rebutted by the "intent of Congress and other inferences that we may rationally draw from the structure and purpose of the statute at hand." *Id.* In *Perri v. United States*, we set forth a three-part test to provide guidance as to when such an inference may be rationally drawn: if the statute (1) provides clear standards for paying an award, (2) states a precise amount to be paid, and (3) compels payment once certain conditions precedent are met. 340 F.3d 1337, 1343 (Fed. Cir. 2003); *see also Samish Indian Nation v. United*

*States*, 419 F.3d 1355, 1364–65 (Fed. Cir. 2005).  But this three-part test is less helpful than looking to the facts of the individual cases as a guide in determining when the use of "may" is money-mandating.

For instance, in *Doe v. United States* ("*Doe I*"), although the Secretary of the Treasury retained discretion to determine the *amount* of the reward, there was no question that a reward was owed if the statutory requirements were met, and we found the rewards statute to be money-mandating.  100 F.3d 1576, 1582 (Fed. Cir. 1996).  In contrast, in *Perri*, the statute was unequivocal that all payments were "at the discretion of the Attorney General," and we held that the statute at issue was not money-mandating.  340 F.3d at 1342 (internal quotation marks omitted).  Similarly, in *Huston v. United States*, the statute was clear that any pay raises were at the discretion of the Army Corps of Engineers, and therefore, it was not money-mandating.  956 F.2d 259, 261–62 (Fed. Cir. 1992).

One relevant principle drawn from the cases is that a statute (or regulation) providing that money "may" be paid is not money-mandating if the statute or regulation only authorizes but does not require the payment of money to the class of which the plaintiff claims to be a member, and contemplates that further implementing regulations will be issued defining the circumstances in which money will be paid.  Thus, for example, in *Adair*, the statute at issue stated that "'[u]nder regulations prescribed by the Secretary of Defense or by the Secretary of Health, Education, and Welfare [("HEW")] . . . [certain military and Public Health Services physicians] . . . *may* . . . be paid [variable incentive pay].'"  648 F.2d at 1320 (emphasis added) (quoting 37 U.S.C. § 313 (repealed 1980)).  The plaintiff physicians in *Adair* sued, alleging that the HEW regulations defining the eligibility criteria were invalid, as they precluded plaintiffs from

receiving variable incentive pay under the statute. *Id.* at 1321–22. The Court of Claims found that the statute was not money-mandating with respect to the plaintiffs, because the statute authorized HEW regulations, and the HEW regulations specifically excluded the plaintiffs from the eligible category. *Id.* at 1321–23. Here, the language of the Act and the DSSR, as a whole, provides only baseline requirements for LQA eligibility and contemplate further implementing regulations. *Compare Doe v. United States* ("*Doe II*"), 463 F.3d 1314, 1324 (Fed. Cir. 2006), *with Adair*, 648 F.2d at 1324.

Roberts points out that § 5922(c) of the Act states that "[t]he allowances and differentials authorized by this subchapter *shall* be paid under regulations prescribed by the President." 5 U.S.C. § 5922(c) (emphasis added). But here the word "shall" indicates that LQA will be paid only if the regulations require it. *See, e.g.*, *Perri*, 340 F.3d at 1341–42 (holding that the statute was only money-authorizing because it contemplated further regulations— stating that "[an] award . . . *shall* be paid at the discretion of the Attorney General or his delegate." (emphasis added)). The DSSR, however, does not on its face mandate LQA. Therefore, the statute and the DSSR, standing alone, are not money-mandating. They could only become money-mandating if further regulations were implemented requiring payment.

This is apparent from the language of the statute and the DSSR. The DSSR delegates authority to the heads of agencies to promulgate further regulations defining the scope of the entitlement, stating:

> When authorized by law, the head of an agency may defray official residence expenses for, and grant [LQA, among other allowances] to an employee of his/her agency and require an accounting therefor, subject to the provisions of these

> regulations and the availability of funds. Within the scope of these regulations, the head of an agency *may issue such further implementing regulations as he/she may deem necessary for the guidance of his/her agency with regard to the granting of and accounting for these payments.*

DSSR § 013 (J.A. 305) (emphasis added). When defining an "employee" under the regulation, the DSSR again contemplates further limiting regulations, stating:

> "<u>Employee</u>" means an individual . . . who is:
>
>  . . .
>
>     (4) eligible for allowances or differential under subchapter 030, including the provisions pertaining to local hires (Section 031.12) and temporary employees (Section 031.4), *as determined by relevant agency authority.*

DSSR § 040(i)(4) (J.A. 310) (emphasis added). We conclude that the statute and DSSR regulations, standing alone, are only money-authorizing and are not money-mandating.

Roberts contends that our predecessor court in *Trifunovich v. United States*, construed the statute and DSSR regulations as mandating an award of LQA to any individual eligible under the DSSR, regardless of the requirements of the *Instruction*, *Order*, or *Job Announcement*. 196 Ct. Cl. 301 (1971). We do not agree.

In *Trifunovich*, the Navy had denied plaintiff's claim for LQA during a posting in London. *Id.* at 308. The Navy argued that, because the language of the statute and the 1961 DSSR regulation was permissive, it was within Navy discretion to deny LQA. *Id.* at 311. But at the time, the DoD and Navy regulations implementing the DSSR used mandatory language. The DoD regula-

tions stated that "[LQA] *will* be paid within the Department of Defense subject to the conditions prescribed below," Add. to Appellee's Br. 7, and the Navy regulations stated that:

> Civilian employees of the Navy who are citizens of the United States, permanently stationed in a foreign country, *will be provided* Government quarters without charge to them, or a quarters allowance *will be granted* [to] eligible employees in accordance with regulations governing the quarters allowance [*i.e.*, the 1961 DSSR regulations].

Add. to Appellee's Br. 244. Thus, the Court of Claims rejected the argument that the statute together with the regulation was not money-mandating, finding that "[p]laintiff's right to recover flows . . . from proof of deprivation of statutory and regulatory rights on an invalid basis." *Trifunovich*, 196 Ct. Cl. at 311.[3] *Trifunovich* does not hold that the statute and the DSSR regulations are money-mandating standing alone. It holds that the

---

[3] At the time, the DSSR required that, for an employee recruited outside the United States to receive LQA, he must have been "temporarily in the foreign area for travel or formal study and immediately prior to such travel or study [have] resided in the United States." *Trifunovich*, 196 Ct. Cl. at 314 (quoting DSSR § 031.12 (1961)). In that case, plaintiff had been traveling in Europe for the eighteen months before his appointment. *Id.* at 307–08. The Navy found that this travel rendered plaintiff ineligible for LQA. *Id.* at 308–09. The Court of Claims disagreed, finding that, despite the length of plaintiff's travel abroad, it was nonetheless temporary, and plaintiff still met the LQA requirements under the DSSR. *Id.* at 310–11, 333.

combination of the statute, DSSR regulations, and the further implementing regulations, specifically the DoD and Navy regulations, requiring LQA under specified circumstances, is money-mandating.[4]

Therefore, we conclude that the statute and the DSSR, standing alone, are not money-mandating, and the Claims Court lacked jurisdiction under Roberts' first theory.

B. Roberts' Second Argument in Support of Jurisdiction

We now turn to Roberts' second argument—that the combination of the statute, the DSSR and the further implementing regulations, the *Instruction* and the *Order*, is money-mandating. Roberts' theory is that the *Instruction* and the *Order* provide for LQA where the MCBJ commander has decided to offer LQA for a particular position or authorized a continuance, and therefore, the statute, the DSSR, and the further implementing regulations, taken together, are money-mandating, particularly because 5 U.S.C. § 5922(c) provides that allowances "shall" be paid where regulations require such payment.

Pursuant to the DSSR delegation, the Defense Secretary issued the *Instruction*, which states in part:

> c. <u>Overseas Allowances and Differentials</u>. *Overseas allowances and differentials are not automatic salary supplements, nor are they entitlements.* They are specifically intended to be recruitment incentives for U.S. citizen civilian employees living in the United States to accept Federal em-

---

[4]  Similarly in *Tyler v. United States*, 600 F.2d 786 (Ct. Cl. 1979) and *Brown v. United States*, 217 Ct. Cl. 710 (1978), the governing DoD regulations used mandatory language. Add. to Appellee's Br. 7 (1961 version of the regulations) and 14 (1969 version of the regulations).

ployment in a foreign area. If a person is already living in the foreign area, that inducement is normally unnecessary. Individuals shall not automatically be granted these benefits simply because they meet eligibility requirements.

d. <u>Recruitment Need</u>. Individuals authorized to grant overseas allowances and differentials shall consider the recruitment need, along with the expense the activity or employing agency will incur, prior to approval.

J.A. 471 (emphasis added). The *Instruction* further delegates LQA authority to the heads of Department of Defense Components. Under the authority of the *Instruction*, the Secretary of the Navy issued SecNav Instruction 12250.6, delegating civilian human resources management, including award of LQA, to the Commandant of the Marine Corps, among others. Thereafter, the Commander of the MCBJ issued the *Order*, which provided that:

16001. <u>POLICY</u>. . . . *LQA is not an entitlement or automatic salary supplement and is normally deemed an unnecessary inducement for persons already living in the foreign area.*

. . .

16003. <u>COMMAND RESPONSIBILITIES</u>

1. <u>LOCAL HIRE</u>

a. LQA is *not authorized* when there are qualified locally available candidates for hire, except when the selectee is currently receiving LQA from MCBJ, or another DoD agency on Okinawa.

. . .

2. <u>GRANTING OF LQA</u>

> a. In determining whether or not to grant LQA, the recruitment need, along with the expense the activity or MCBJ will incur, shall be considered.

J.A. 514–15 (emphases added). The *Order* contemplated that the hiring authority would make a determination in each case whether a particular position carried an entitlement to LQA, but also provided that "[a]pplicants currently receiving LQA from another DoD component on island may be granted continuance of LQA at management's discretion." J.A. 514. The *Instruction* and the *Order*, combined with the statute and DSSR regulations, are fairly construed as money-mandating because the payment of money is *required* when the MCBJ Commander, acting pursuant to the *Order*, determines that a particular post is LQA-eligible or an individual should receive an LQA-continuance (*i.e.*, LQA "shall be paid," 5 U.S.C. § 5922(c), in these instances).[5] *See Doe II*, 463 F.3d at 1325. Under *Doe II*, once the regulations provide that a particular class is entitled to LQA and the plaintiff alleges that he is within that class, the regulations are money-mandating and the court has jurisdiction. *Id.* The question of whether Roberts in fact is within a class and entitled to LQA is a merits issue. The Claims Court properly exercised jurisdiction under Roberts' second jurisdictional theory.

---

[5] We do not need to decide whether the *Instruction* and the *Order*, standing alone, would be money-mandating. *See Hamlet v. United States*, 63 F.3d 1097, 1105 (Fed. Cir. 1995). We hold only that when combined with the Act and the DSSR regulation, the combination is money-mandating.

## II. Merits of Roberts' Claim

As we recognized in *Fisher*, whether Roberts can recover under the particular facts of the case is a merits question and not a jurisdictional issue. *Fisher*, 402 F.3d at 1175–76. Here, Roberts' recovery turns on whether he is a member of a class entitled to LQA under the *Order* and the *Job Announcement*. On the merits, the MCBJ in the *Job Announcement* decided not to offer an LQA entitlement for Roberts' position or the other DCC positions on Okinawa, so he was not entitled to LQA under the *Job Announcement*. But Roberts could still receive LQA under the *Order* if he were already receiving it for a Department of Defense posting in Okinawa. Roberts did not receive LQA but rather an allowance from the Marine Corps as an active-duty Marine. Thus, he was ineligible for a continuance. Because Roberts' DCC position was not designated as LQA-eligible and Roberts was not eligible for a continuance of LQA benefits, he was not entitled to LQA. Therefore, OPM did not err in denying Roberts LQA.

Finally, Roberts argues that, even if limiting regulations were appropriate in some circumstances, the *Instruction* and the *Order* here contravene the Act's goal to provide LQA for all overseas employees as compensation for the hardship of working abroad. In other words, he appears to argue that the *Instruction* and the *Order* can limit LQA only when based on a lack of hardship criteria. But the Act states no such requirement. In fact, both the DSSR and *Trifunovich* recognize that the statute specifically designated LQA as a recruitment and retention incentive. *Trifunovich*, 196 Ct. Cl. at 305. In any case, Roberts appears to be challenging the *Instruction* and the *Order* under the Administrative Procedure Act ("APA"). Such a claim must be brought in a federal district court, rather than in the Claims Court. *See Bowen v. Massachusetts*, 487 U.S. 879, 891 n.16 (1988) (noting that the

federal district courts may review agency action under the APA pursuant to their federal question jurisdiction). The Claims Court, and by extension, this court, has no jurisdiction to hear claims challenging the substantive validity or reasonableness of the government's actions. *See Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1370 n.11 (Fed. Cir. 2005) ("Of course, no APA review is available in the Court of Federal Claims."); *Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1998) (affirming that the Claims Court "lacks the general federal question jurisdiction of the district courts, which would allow it to review the agency's actions and to grant relief pursuant to the [APA]").

## CONCLUSION

The Claims Court had jurisdiction to consider Roberts' claim. We conclude, however, that Roberts was properly denied LQA benefits.

**APPEAL NO. 2012-5113 AFFIRMED**

**APPEAL NO. 2012-5114 DISMISSED**

## COSTS

No costs.