NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**BUTTE COUNTY, IDAHO,**

*Plaintiff-Appellant*

**v.**

**UNITED STATES,**

*Defendant-Appellee*

---

2021-1779

---

Appeal from the United States Court of Federal Claims in No. 1:19-cv-00800-EMR, Judge Eleni M. Roumel.

---

Decided:  March 4, 2022

---

ALAN IRVING SALTMAN, Chevy Chase, MD, argued for plaintiff-appellant.  Also represented by STEVE L. STEPHENS, I, Arco, ID.

DANIEL B. VOLK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by BRIAN M. BOYNTON, LISA LEFANTE DONAHUE, MARTIN F. HOCKEY, JR.

---

Before NEWMAN, DYK, and TARANTO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TARANTO.

Opinion dissenting in part and concurring in part filed by *Circuit Judge* NEWMAN.

TARANTO, *Circuit Judge*.

In 1984, the United States Department of Energy (DOE) contracted with the operator of the failed Three Mile Island nuclear reactor to take possession of the damaged nuclear core material. Between 1986 and 1990, DOE moved the material to a DOE facility located mostly within Butte County, Idaho. In 2019, Butte County sued the United States in the Court of Federal Claims (Claims Court), asserting a violation of Part B of the Nuclear Waste Policy Act of 1982 (NWPA), 42 U.S.C. §§ 10151–57 (effective Jan. 7, 1983), as a basis for monetary damages under the Tucker Act, 28 U.S.C. § 1491(a)(1). Specifically, Butte County alleged that DOE was storing the material pursuant to NWPA provisions governing interim storage capacity for spent nuclear fuel and that Butte County was entitled to "impact assistance payments" under 42 U.S.C. § 10156(e)(1).

The United States moved to dismiss, and the Claims Court granted the motion on two grounds. *Butte County, Idaho v. United States*, 151 Fed. Cl. 808, 812 (2021). First, the Claims Court held that it lacked jurisdiction under the Tucker Act because Butte County's claim was untimely under 28 U.S.C. § 2501. *Id.* at 815–18. Second, it held that Butte County failed to state a claim for payments under 42 U.S.C. § 10156(e). *Id.* at 818–20.

Butte County appeals. We affirm the judgment dismissing the case for lack of jurisdiction, though not on the timeliness ground. Even if the suit were timely, jurisdiction under the Tucker Act would require that the "impact assistance payments" provision of the NWPA be money-mandating for Butte County's claim of violation. We

conclude that the provision is not money-mandating for Butte County, a conclusion that defeats Tucker Act jurisdiction.  We decide no other issue.

I

A

In 1982, Congress enacted the NWPA, 42 U.S.C. §§ 10101–270, to address the accumulation of nuclear waste at civilian nuclear power plants.  *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1337 (Fed. Cir. 2000).  In Part B of the NWPA, 42 U.S.C. §§ 10151–57, Congress addressed "interim storage of spent nuclear fuel" from civilian nuclear power reactors, § 10151(a), and declared a federal responsibility to provide up to a specified amount of such interim storage for "civilian nuclear power reactors that cannot reasonably provide adequate storage capacity at the sites of such reactors when needed to assure the continued, orderly operation of such reactors," § 10151(a)(3).  In particular, Congress "authorized [the Secretary of Energy] to enter into contracts with persons who generate or own spent nuclear fuel resulting from civilian nuclear activities for the storage of such spent nuclear fuel in any storage capacity provided under this part."  § 10156(a)(1).  And it directed the Secretary to "provide . . . not more than 1,900 metric tons of capacity for the storage of spent nuclear fuel from civilian nuclear power reactors," "when needed, as determined on the basis of the storage needs specified in contracts entered into under section 10156(a)."  § 10155(a)(1), (5).

The statute made contracts for interim storage under § 10156(a) the foundation for storage under the Part B of the NWPA.  A number of provisions address those contracts and their consequences.

First, the Secretary had authority to enter into § 10156(a) contracts only between January 7, 1983, and

January 1, 1990. § 10156(a)(1). There has been no such authority for three decades now.

Second, the Secretary could enter into a § 10156(a) contract

> only if the [Nuclear Regulatory] Commission determine[d] that—
>
> > (A) adequate storage capacity to ensure the continued orderly operation of the civilian nuclear power reactor at which such spent nuclear fuel is generated cannot reasonably be provided by the person owning and operating such reactor at such site, or at the site of any other civilian nuclear power reactor operated by such person, and such capacity cannot be made available in a timely manner through any method described in subparagraph (B); and
> >
> > (B) such person is diligently pursuing licensed alternatives to the use of Federal storage capacity for the storage of spent nuclear fuel expected to be generated by such person in the future.

§ 10155(b)(1). In turn, the statute ties the content of § 10156(a) contracts to such determinations, stating that such contracts "shall provide that the Federal Government will . . . take title . . . to such amounts of spent nuclear fuel from the civilian nuclear power reactor as the Commission determines cannot be stored onsite" and transport it to a federal facility elsewhere and store it there "pending further processing." § 10156(a)(1). The Commission, for its

part, was to "propose, by rule, procedures and criteria" for the required determinations. § 10155(g).[1]

Third, the Secretary was required to publish an annual nondiscriminatory fee schedule for the provision of the covered storage, § 10156(a)(2)–(3), and any contracts were required to "provide for payment to the Secretary of fees determined in accordance with" that schedule, § 10156(a)(1). In 1983, DOE published its fee schedule for calendar year 1984 (never updated since, as far as we have been informed). Payment Charges for Federal Interim Storage, Calendar Year 1984, 48 Fed. Reg. 54,391, 54,391–92 (Dec. 2, 1983).[2] Under the schedule, the amount of assessed storage fees would be based on the capacity of the federal interim storage facility used to store the spent nuclear fuel, whose design would be based in turn on "the contractual commitments that then exist for [federal interim

---

[1]    In 1985, the Commission promulgated such regulations, codified in 10 C.F.R. pt. 53. Criteria and Procedures for Determining the Adequacy of Available Spent Nuclear Fuel Storage Capacity, 50 Fed. Reg. 5,548, 5,548 (Feb. 11, 1985). In 1996, the Commission repealed the regulations, stating that "the statutory time period within which Federal interim storage under this rule could be implemented has long passed" and it had "received no requests for interim storage" since the 1985 promulgation. Removal of 10 CFR Part 53—Criteria and Procedures for Determining the Adequacy of Available Spent Nuclear Fuel Storage Capacity, 61 Fed. Reg. 35,935, 35,935–36 (July 9, 1996).

[2]    This DOE regulation and the 1985 Commission regulation discussed *supra* note 1 addressed procedures and criteria for determining whether adequate on-site storage capacity existed and payments to be made to the Secretary for storage under the statute. Neither regulation defined the circumstances under which "impact assistance payments" would be made pursuant to § 10156(e).

storage] services." *Id.* at 54,392.  DOE would also "bill each individual user for the actual costs [DOE] incurs in the transportation of that user's spent fuel to the [federal interim storage] facilities." *Id.*

Fourth, the fees collected under contracts were to be placed in an "Interim Storage Fund."  42 U.S.C. § 10156(c). The government could use the "storage capacity provided under this part" to store spent nuclear fuel owned by a federal department, but if it did, the department had to contribute money to the Interim Storage Fund as "if such spent nuclear fuel were generated by any other person." § 10156(b).

Finally, and of central importance here, Congress included § 10156(e), titled "[i]mpact assistance," to address the use of Fund money.  The subsection states:

> Beginning the first fiscal year which commences after January 7, 1983, the Secretary shall make annual impact assistance payments to a State or appropriate unit of local government, or both, in order to mitigate social or economic impacts occasioned by the establishment and subsequent operation of any interim storage capacity within the jurisdic[]tional boundaries of such government or governments and authorized under this part: *Provided, however*, That such impact assistance payments shall not exceed (A) ten per centum of the costs incurred in paragraphs (1) and (2), or (B) $15 per kilogram of spent fuel, whichever is less . . . .

§ 10156(e)(1).  Such payments were to be "made available solely from the fees determined under" § 10156(a). § 10156(e)(4).

While directing the Secretary to decide which governmental entity (state or local) would receive payments, Congress stated broadly that payments "shall be . . . allocated in a fair and equitable manner with a priority to those

States or units of local government suffering the most severe impacts," and it also restricted recipients' use to "planning," "construction and maintenance of public services," "provision of public services related to" the storage, and "compensation for loss of taxable property equivalent to that if the storage had been provided under private ownership." § 10156(e)(2). Congress further stated: "Such payments shall be subject to such terms and conditions as the Secretary determines necessary to ensure that the purposes of this subsection shall be achieved." § 10156(e)(3). Congress "authorized" the Secretary, before establishing storage capacity, "to consult with States and appropriate units of local government" regarding the amount of payments each "would be eligible to receive." § 10156(e)(5). Reflecting the high level of generality of the statutory standards, Congress directed the Secretary to "issue such regulations as may be necessary to carry out the provisions of this subsection." § 10156(e)(3). It is undisputed before us that no such regulations were ever promulgated.

B

In 1979, the "TMI-2" reactor at the nuclear power plant on Three Mile Island in Pennsylvania experienced a partial meltdown. In 1984, the DOE entered into a contract with GPU Nuclear Corporation, the agent of the joint owners of the reactor, to enable "transportation, storage and disposal of the core material of [TMI-2]." J.A. 61. The contract recited that "DOE is authorized to conduct a research and development program to examine the damaged reactor core so as to enhance understanding of degraded core performance" and that it was "executed under the authority of the Atomic Energy Act of 1954." *Id.* It is undisputed that the contract (originally and as later modified) made no reference to the NWPA. The contract provided for payments by GPU to DOE, but it did not refer to the NWPA fee schedule that DOE had published in 1983, and Butte County does not contend that the amounts paid aligned with that schedule or that any Interim Storage Fund was even

created, let alone received the GPU-paid fees.  Nor has Butte County identified a Nuclear Regulatory Commission decision that made the NWPA-required set of determinations for the contract.  Pursuant to the contract, from 1986 to 1990 the core material—about 83 metric tons of uranium contained in about 139 metric tons of other material removed from the reactor vessel—was transported from Three Mile Island to DOE facilities located at least partly within Butte County, Idaho, where it remains today.[3]

In 2019, almost three decades after the transfer was complete, Butte County sued the United States in the Claims Court under the Tucker Act.  Butte County alleged that although the DOE-GPU contract "did not refer to, contemplate or otherwise address the Department of Energy's obligations under Sub-Title B of the [NWPA]," J.A. 40, it was nonetheless a contract for interim storage of spent nuclear fuel under § 10156(a).  Butte County argued that DOE had "contracted to accept and store commercial spent nuclear fuel from GPU in 1984 . . . pursuant to the [NWPA]" but then "failed to comply with the provisions of Section 10156."  J.A. 47.  In support of its characterization of the 1984 contract, it asserted that a DOE official linked the contract to the NWPA in 1984 testimony to Congress.  J.A 36–38.  Butte County further alleged that the United States Navy had stored uranium at the DOE Idaho facility and should have paid money into an Interim Storage Fund under § 10156(b).  J.A. 45.  Based on those allegations, and the general allegation of harm to itself and the communities and residents it serves, Butte County asserted that it was entitled to annual impact assistance payments under § 10156(e) back to 2013—six years before the 2019 filing,

---

[3]    According to Butte County, a suit by the State of Idaho against DOE, brought in the early 1990s and settled in 1995, led to relocation of material from one DOE location within Butte County to another.  J.A. 40–41.

as allegedly permitted by the six-year statute of limitations.  J.A. 51; *see also* 28 U.S.C. § 2501.

The United States moved to dismiss the suit under Rule 12(b)(1) of the Rules of the Court of Federal Claims (lack of jurisdiction) and under Rule 12(b)(6) (failure to state a claim).  Butte County filed a cross-motion for summary judgment.  The Claims Court granted the United States' motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6).  *Butte County*, 151 Fed. Cl. at 812.

First, the Claims Court held that jurisdiction was lacking because Butte County's suit was untimely under the six-year statute of limitations, 28 U.S.C. § 2501.  *Butte County*, 151 Fed. Cl. at 815; *see John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008) (§ 2501 is jurisdictional).  The court concluded that the county's claims accrued, at the latest, in 1990, when the statutory authority for DOE to enter a § 10156(a) contract expired, so the time for filing had run by 1996.  *Butte County*, 151 Fed. Cl. at 815–18.  The court reasoned that "all the events giving rise to liability occurred when DOE entered into the alleged unlawful contract with GPU in 1984 or, at the very latest, when the authority to enter into a section 10156(a) contract expired in 1990." *Id.* at 817.  Rejecting Butte County's contention that a new claim accrued each year when DOE failed to pay impact assistance to Butte County, the Claims Court explained that "Butte County's harm does not arise out of a series of failures to make periodic payments but rather out of a single failure to enter into a proper 10156(a) contract." *Id.* (citing *Hart v. United States*, 910 F.2d 815, 818 (Fed. Cir. 1990)).

Second, the Claims Court held in the alternative that Butte County had failed to state a claim, because its allegations did not support an entitlement to impact assistance payments.  *Id.* at 818–20.  The court reasoned that Butte County had not shown that the DOE-GPU contract had been entered into under § 10156(a) to begin with.  *Id.* at

818–19.  And the court rejected Butte County's claim that it was entitled to payments even in the absence of a § 10156(a) contract.  *Id.* at 819–20.

Butte County appeals.  We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II

We review de novo the Claims Court's dismissal of a case for lack of subject matter jurisdiction, while taking as true all undisputed facts asserted in the complaint and drawing all reasonable inferences in favor of the plaintiff.  *Trusted Integration, Inc. v. United States*, 659 F.3d 1159, 1163 (Fed. Cir. 2011).  Here, timeliness is a jurisdictional requirement.  *See John R. Sand*, 552 U.S. at 133–34.  But it is not the only jurisdictional requirement.

An additional jurisdictional requirement relates to the character of the source of substantive law whose violation is asserted as the basis for money damages.  Specifically, under longstanding precedents, the presence of jurisdiction in this case would require that the statutory provisions Butte County has identified as the basis of its Tucker Act suit—the relevant provisions of the NWPA—be fairly interpreted as "money-mandating as to the particular class of plaintiffs" of which Butte County is a part, namely, local governments.  *Greenlee County, Ariz. v. United States*, 487 F.3d 871, 876 & n.2 (Fed. Cir. 2007); *see, e.g.*, *Acevedo v. United States*, 824 F.3d 1365, 1368 (Fed. Cir. 2016); *Roberts v. United States*, 745 F.3d 1158, 1162 (Fed. Cir. 2014); *Jan's Helicopter Service, Inc. v. Fed. Aviation Admin.*, 525 F.3d 1299, 1307 (Fed. Cir. 2008); *Perri v. United States*, 340 F.3d 1337, 1342 (Fed. Cir. 2003); *see also Maine Community Health Options v. United States*, 140 S. Ct. 1308, 1328–29 (2019); *United States v. Mitchell*, 463 U.S. 206, 218

(1983).[4]  Even if we deemed Butte County's complaint timely, we would have to find the NWPA provisions to be money-mandating under that approach in order to disturb the jurisdictional dismissal on appeal.

"Every federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review . . . ."  *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 95 (1998) (cleaned up).  There is no required sequence for considering jurisdictional requirements: "[A] federal court has leeway 'to choose among threshold grounds for denying audience to a case on the merits.'"  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.*, 549 U.S. 422, 431 (2007) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999), and citing *Steel Co.*, 523 U.S. at 100–01 n.3).  A determination that any jurisdictional requirement is not met defeats jurisdiction, making it unnecessary to consider other jurisdictional requirements.

Here, we choose to address whether the NWPA provisions meet the jurisdictional money-mandating requirement.  We conclude that they do not, so there is no Tucker

---

[4]    In *Brownback v. King*, the Supreme Court required a plausible allegation of all elements of substantive liability for *jurisdiction* under the Federal Tort Claims Act's jurisdictional provision, 28 U.S.C. § 1346(b), explaining that where sovereign immunity is at issue, the failure-to-state-a-claim issue can be jurisdictional.  141 S. Ct. 740, 749–50 (2021).  We need not consider whether *Brownback* suggests that, for Tucker Act jurisdiction, not only the money-mandating aspect of the inquiry into the underlying source of law, but also a plausible basis for all elements of liability under that source of law, might be a jurisdictional requirement.  The money-mandating requirement is jurisdictional under our existing precedent, and that requirement decides this case.

Act jurisdiction over this action.  We need not reach any other issue, including the timeliness issue.

A

We have held in a number of cases that an underlying source of law was not money-mandating when that law made the government's action regarding the plaintiff's group sufficiently discretionary that the law could not "fairly be interpreted as mandating compensation by the Federal Government for the damage sustained" from a violation.  *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (cleaned up).  As we said of the Little Tucker Act, 28 U.S.C. § 1346(a), for which the pertinent standard is the same, "[a] statutory or regulatory provision that grants a government official or agency substantial discretion to decide whether to expend government funds in a particular way is not considered money-mandating . . . ."  *Price v. Panetta*, 674 F.3d 1335, 1339 (Fed. Cir. 2012).  The language of the source of law, including whether it uses "may" and "shall" language, is central to the inquiry, but "may" language does not conclusively bar money-mandating status, and "shall" language does not conclusively confer it.  In particular, the effect of "shall" language depends, at a minimum, on the words that follow it, which may make the provision sufficiently discretionary to defeat Tucker Act jurisdiction.

In *Huston v. United States*, we held a statute permitting a pay raise not to be money-mandating, noting that it provided that the pay at issue "may" be raised and gave the government "great discretion in deciding whether to grant—or not to grant—a pay increase."  956 F.2d 259, 261 (Fed. Cir. 1992).  The court added that, although the government had promulgated regulations on the subject, those regulations "d[id] not curtail discretion."  *Id.* at 262; *see also id.* (finding support in *Adair v. United States*, 648 F.2d 1318 (Ct. Cl. 1981), and distinguishing *Bradley v. United States*, 870 F.2d 1578 (Fed. Cir. 1989)).

In *Perri*, we held not to be money-mandating a statute that permitted payments from a government fund to persons who provide information or assistance about certain legal violations. 340 F.3d at 1341–42. We relied first on the "discretion" as to payment seemingly reflected in the statutory language and, second, "in any event," if there was uncertainty about the language, on the absence of "standards for determining" the payments at issue, and we noted that the statute "d[id] not specify the amount to be paid or the basis for determining such amount." *Id.* at 1342 ("'[T]he allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to a certain sum.'" (citing *Eastport Steamship Corp. v. United* States, 372 F.2d 1002, 1007 (Ct. Cl. 1967))). We distinguished *Doe v. United States*, 100 F.3d 1576 (Fed. Cir. 1996), on the ground, among others, that the statute at issue there "provide[d] clear standards for paying" what was claimed and "required the [government] to make payment to anyone who met [the] conditions" specified in the standards. *Perri*, 340 F.3d at 1343. The court explained that the statute in *Perri* lacked such "detailed standards" and therefore left payment to government discretion, making the statute not money-mandating. *Id*; *cf. McBryde v. United States*, 299 F.3d 1357, 1361–64 (Fed. Cir. 2002) (concluding that a statute providing that the government "may pay" certain legal fees incurred by a judge was not discretionary–and thus was money-mandating—based on the legislative history of the statute).

In *Roberts*, we first held that a statute and one particular implementing regulation, by themselves, were not money-mandating. 745 F.3d at 1162–65. The statute provided that a living-quarters allowance "may" be paid and also that it "shall" be paid "under regulations prescribed by the President," and the particular regulation itself left it to agency heads to adopt "such further implementing regulations as he/she may deem necessary." *Id.* at 1164. Those provisions, we concluded, "could only become money-

mandating if *further* regulations were implemented requiring payment." *Id.* (emphasis added). We then held that there was such a further regulation (in the form of an Instruction and implementing Order) requiring payment under certain conditions. *Id.* at 1165–67. The additional regulatory requirement, combined with the statute and initial regulation, sufficed to create a money-mandating source of law for the plaintiff's claim under the Tucker Act. *Id.* at 1167 (citing *Doe v. United States*, 463 F.3d 1314, 1325 (Fed. Cir. 2006)).

In *Acevedo*, which involved a claim for danger pay allowance, we drew the same conclusion as the first, not-money-mandating conclusion of *Roberts*. 824 F.3d at 1368–70. Unlike in *Roberts*, however, there was no further regulation establishing an entitlement to payment under defined conditions, and an alleged "unwritten policy" would not suffice. *Id.* at 1370. Therefore, the court affirmed the dismissal for lack of jurisdiction. *Id.*; *see also Bell v. United States*, 20 F.4th 768, 770 (Fed. Cir. 2021) (holding that discretion-granting statute did not support jurisdiction).

B

In this case, we conclude, the discretion afforded DOE as to payments to local government is too broad to characterize the NWPA provisions as money-mandating for Butte County. Even aside from questions about DOE discretion regarding entering into a contract, the provisions governing impact assistance payments do not sufficiently limit DOE payment discretion to be fairly interpreted as mandating monetary liability in court for non-payment to local governments. Our conclusion is specific to § 10156(e), which, we note, was never implemented by regulations.

Although the statute uses "shall" language ("the Secretary shall make annual impact assistance payments . . ."), the use of "shall" in this statute does not support a money-mandating characterization, even aside from the very loose character of the standards for such payments included in

the statute.  The statute does not say that the Secretary shall make payments *to local governments*, such as Butte County.  42 U.S.C. § 10156(e)(1).  Rather, the "shall" language gives the Secretary a choice about recipients: "to a State *or* appropriate unit of local government, or both."  *Id.* (emphasis added).  This "shall" language, therefore, does not say that payment "shall" be made "to the particular class of plaintiffs" of which the claimant is a part.  *Greenlee County*, 487 F.3d at 876 n.2.  In this respect, the statute is critically different from the statutes at issue in other cases where we relied on "shall" language to hold a source of law to be money-mandating.  *See id.* at 877 ("Section 6902(a)(1) provides that 'the Secretary of the Interior *shall make a payment* for each fiscal year to each unit of general local government in which entitlement land is located as set forth in this chapter,' and § 6903 provides a detailed mechanism for calculating these payments."); *Agwiak v. United States*, 347 F.3d 1375, 1380 (Fed. Cir. 2003) (similar as to plaintiff class); *Martinez v. United Sates*, 333 F.3d 1295, 1303 (Fed. Cir. 2003) (en banc) (similar as to plaintiff class).

In addition, the standards stated in the statute are the kind of very broad standards—as opposed to clear or detailed conditions—we have found insufficient to render a statute money-mandating.  *See, e.g.*, *Greenlee County*, 487 F.3d at 877; *Perri*, 340 F.3d at 1343.  The impact assistance payments were supposed "to mitigate social or economic impacts" of storage.  § 10156(e)(1).  Allocation of payments was to be "fair and equitable," with priority for "those States or units of local government suffering the most severe impacts."  § 10156(e)(2)(A).  And at least apart from the tax-loss standard, the standards governing permitted uses of funds are of a highly general nature—planning, construction, maintenance, and provision of public services related to the storage—necessitating exercise of substantial discretion by the Secretary to decide whether payments should be made.  § 10156(e)(2)(B).  The statute sets no

minimum amount of payment due to any recipient, let alone any individual local government; it merely identifies a *maximum*. § 10156(e)(1) ("[S]uch impact assistance payments shall not exceed . . . ."). Thus, the statute provides significant discretion to DOE in deciding whom to pay, for what purposes the payments are limited, and how much to pay. And Congress expressly provided for DOE discretion, stating that any payments were to be "subject to such terms and conditions as the Secretary determines necessary to ensure that the purposes of this subsection shall be achieved." § 10156(e)(3).

Congress did direct DOE to "issue such regulations as may be necessary to carry out the provisions of this subsection." § 10156(e)(3). If DOE had promulgated regulations, they might have created an entitlement of the sort ultimately found in *Roberts*. But DOE never promulgated such regulations. Only the statute provides any standards, and like the standards of the statute (and primary regulation) at issue in *Roberts*, the statutory standards are infused with discretion and so do not support a determination that the NWPA is money-mandating for Butte County.

We conclude, therefore, that the Claims Court lacked jurisdiction under the Tucker Act to hear Butte County's claim. It therefore properly dismissed the case.

### III

For the foregoing reasons, we affirm the decision of the Claims Court.

The parties shall bear their own costs.

**AFFIRMED**

# United States Court of Appeals
# for the Federal Circuit

---

**BUTTE COUNTY, IDAHO,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2021-1779

---

Appeal from the United States Court of Federal Claims in No. 1:19-cv-00800-EMR, Judge Eleni M. Roumel.

NEWMAN, *Circuit Judge*, dissenting in part, concurring in part.

I agree that this appeal should be dismissed. However, I do not share the view that the Nuclear Waste Policy Act, Title I, Schedule B (the "NWPA"), at 42 U.S.C. §§ 10151–10157, is not a money-mandating statute for purposes of Tucker Act jurisdiction. These provisions of the NWPA provide for payment by the federal government to state or local governments in designated circumstances. I do not share my colleagues' view that, were this claim timely, there would not be subject matter jurisdiction under the Tucker Act—a position not taken by the government, a position contrary to the jurisdictional ruling of the Court of Federal Claims, and unsupported by precedent.

The Court of Federal Claims held that the Tucker Act's six-year Statute of Limitations bars this action. I agree. The relevant NWPA activity terminated in 1990, and no ensuing event tolled accrual of the time bar for Butte County's claims. I would affirm the ruling of the Court of Federal Claims,[1] and avoid the majority's *sua sponte* holding that departs from precedent for money-mandating statutes.

I

### *The Nuclear Waste Policy Act mandates monetary compensation to affected state and local governments*

A money-mandating statute is one that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained" from the government's exercise of authorized authority. *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472 (2003) (quoting *United States v. Mitchell*, 463 U.S. 206, 217 (1983)), *see also United States v. Testan*, 424 U.S. 392, 400 (1976). The NWPA can fairly be interpreted as money-mandating.

The NWPA, in Title I, provides for government storage of spent nuclear fuel and other reactor waste, with impact assistance payments to state and local governments affected by the storage. Relevant provisions of the NWPA include:

> 42 U.S.C. § 10156(e)(1).    Beginning the first fiscal year which commences after January 7, 1983, the Secretary shall make annual impact assistance payments to a State or appropriate unit of local government, or both, in order to mitigate social or economic

---

[1]    *Butte Cty., Idaho v. United States*, 151 Fed. Cl. 808 (2021) ("*Fed. Cl. Op.*").

impacts occasioned by the establishment and subsequent operation of any interim storage capacity within the [jurisdictional] boundaries of such government or governments and authorized under this part: *Provided, however*, That such impact assistance payments shall not exceed (A) ten per centum of the costs incurred in paragraphs (1) and (2), or (B) $15 per kilogram of spent fuel, whichever is less;

**\* \* \***

(5) The Secretary is authorized to consult with States and appropriate units of local government in advance of commencement of establishment of storage capacity authorized under this part in an effort to determine the level of the payment such government would be eligible to receive pursuant to this subsection.

(6) As used in this subsection, the term "unit of local government" means a county, parish, township, municipality, and shall include a borough existing in the State of Alaska on January 7, 1983, and any other unit of government below the State level which is a unit of general government as determined by the Secretary.

The court today holds that the NWPA is not a money-mandating statute, despite the mandatory "shall" in § 10156(e)(1) commanding that "the Secretary shall make annual impact assistance payments," as quoted *ante*. This is a routine money-mandating provision, whose conditions are ensconced in precedent.

Here, the government stored nuclear-reactor core material from Three Mile Island, at the Idaho National Laboratory in Butte County. The government does not dispute that the NWPA is a money-mandating statute—although the government argued other reasons why the NWPA does not apply also. The Court of Federal Claims ruled that

Butte County's claim was barred by the six-year Tucker Act period of limitation.

My colleagues do not review the ground adopted by the Court of Federal Claims, and instead hold that the NWPA is not money-mandating.  My colleagues hold that the words "shall make annual impact assistance payments" are not money-mandating, offering the reason that "the standards stated in the statute are the kind of very broad standards—as opposed to clear or detailed conditions—we have found insufficient to render a statute money-mandating." Maj. Op. at 15.  However, this holding does not comport with the plain reading of the statute, its legislative purpose, and extensive precedent.

The facts hereof do not allow the line of reasoning now proposed by the court, and in all events the NWPA does contain "clear or detailed conditions" for the class of payments provided by the statute.  Section 10156(e)(1) sets a limit on such payments, *see ante*, and § 10156(e) includes the following conditions:

> (e)(2).  Payments made available to States and units of local government pursuant to this section shall be-
>
> (A)  allocated in a fair and equitable manner with a priority to those States or units of local government suffering the most severe impacts; and
>
> (B)  utilized by States or units of local governments only for (i) planning, (ii) construction and maintenance of public services, (iii) provision of public services related to the providing of such interim storage authorized under this subchapter, and (iv) compensation for loss of taxable property equivalent to that if the storage had been provided under private ownership.

(e)(3). Such payments shall be subject to such terms and conditions as the Secretary determines necessary to ensure that the purposes of this subsection shall be achieved. The Secretary shall issue such regulations as may be necessary to carry out the provisions of this subsection.

(e)(4). Payments under this subsection shall be made available solely from the fees determined under subsection (a).

Supreme Court precedent on "shall pay" money-mandating statutes provides a solid foundation for the money-mandating character of the NWPA provisions. In *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020), the Court reversed a Federal Circuit ruling that certain provisions of the Patient Protection and Affordable Care Act were not money-mandating. The Court explained that

> the Affordable Care Act differentiates between when the HHS Secretary 'shall' take certain actions and when she 'may' exercise discretion. . . . "When," as is the case here, Congress "distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty."

*Id.* at 1321 (quoting *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016)). In § 10156(e)(1), the NWPA uses the mandatory word "shall," while other provisions of the NWPA use the permissive word "may," for example:

> § 10156(d). The Secretary may make expenditures from the Storage Fund, subject to subsection (e), for any purpose necessary or appropriate to the conduct of the functions and activities of the Secretary.

This legislative precision and detail negate the court's holding that "shall pay" in the NWPA is not money-

mandating.  The sole purported authority cited by the majority is readily distinguished, for in *Roberts v. United States*, 745 F.3d 1158, 1162 (Fed. Cir. 2014), on an issue of payment of housing allowances for overseas federal employees, the payment statute used the word "may":

> 5 U.S.C. § 5923(a). When Government owned or rented quarters are not provided without charge for an employee in a foreign area, one or more of the following quarters allowances may be granted when applicable.

Litigation arose because another provision used the word "shall":

> 5 U.S.C. § 5922(c).  The allowances and differentials authorized by this subchapter shall be paid under regulations prescribed by the President . . .

The court held that § 5922 allows the President to prescribe regulations for payment of allowances, and therefore relates to how the allowances are paid, not whether they must always be granted.  *Id.* at 1162–65.  As the Court explained in *Maine Community. Health*, 140 S. Ct. at 1323 (2020), "[t]his Court generally presumes that 'when Congress includes particular language in one section of a statute but omits it in another,' Congress 'intended a difference in meaning.'" (quoting *Digital Realty Trust, Inc. v. Somers*, 138 S. Ct. 767, 777 (2018))).  Thus this statute, in *Roberts*, was held not to be money-mandating.

The difference between 5 U.S.C. § 5923(a) and 42 U.S.C. § 10156(e)(1) is apparent.  In *Roberts*, the statute provides that housing allowances <u>may</u> be granted, while the NWPA provides that "the Secretary <u>shall</u> make annual impact assistance payments" under the statutory conditions.  However, the majority holds that this legislated obligation does not arise—contrary to the statute and contrary to precedent.

The majority also reasons that the absence of a "mini-
mum amount of payment due to any recipient" in the
NWPA's provisions itself avoids the money-mandating cat-
egory.  Maj. Op. at 16.  This ruling contravenes a wealth of
jurisprudence.  In *White Mountain Apache*, 537 U.S. at 473,
the Court affirmed that money-mandating provisions in
statutes providing for government activity "need [not] be
construed in the manner appropriate to waivers of sover-
eign immunity." (quoting *Mitchell*, 463 U.S. at 218).  The
Court explained:

> It is enough, then, that a statute creating a Tucker
> Act right be reasonably amenable to the reading that
> it mandates a right of recovery in damages.  While
> the premise to a Tucker Act claim will not be "lightly
> inferred," a fair inference will do.

*White Mountain Apache*, 537 U.S. at 473 (quoting *Mitchell*,
463 U.S. at 218).  Applying the Indian Tucker Act to an
issue of breach of the government's statutory fiduciary duty
concerning Indian lands, 74 Stat. 8, the Court stated:

> To the extent that the Government would demand
> an explicit provision for money damages to support
> every claim that might be brought under the Tucker
> Act, it would substitute a plain and explicit state-
> ment standard for the less demanding requirement
> of fair inference that the law was meant to provide a
> damages remedy for breach of a duty.

*White Mountain Apache*, 537 U.S. at 477.  In *Mitchell*, the
statute entitled the plaintiff to payment although the
method of calculating the payment was delegated to the
Secretary of the Interior, the statute stating:

> No grant of a right-of-way shall be made without the
> payment of such compensation as the Secretary of
> the Interior shall determine to be just.  The compen-
> sation received on behalf of the Indian owners shall

> be disposed of under rules and regulations to be pre-
> scribed by the Secretary of the Interior.

25 U.S.C. § 325, *see also Mitchell*, 463 U.S. at 223 (discussing same).

The NWPA similarly assigned the Secretary to determine the amount of impact assistance payments "allocated in a fair and equitable manner with a priority to those States or units of local government suffering the most severe impacts." 42 U.S.C. § 10156(e). Congress stated the principles to be followed, such as limiting the uses to which local governments could put the impact payments, to "(i) planning, (ii) construction and maintenance of public services, (iii) provision of public services related to the providing of such interim storage authorized under this subchapter, and (iv) compensation for loss of taxable property equivalent to that if the storage had been provided under private ownership." *Id.* at § 10156(e)(2)(B). However, the court now holds that since these standards are "of a highly general nature," and since the Secretary of Energy possesses "substantial discretion . . . to decide whether payments should be made," the statute is not money-mandating. Maj. Op. at 15. With respect, the court is wrong.

First, the court misperceives the role of discretion in statutory administration. Discretion does not authorize negating or contradicting the statute; to the contrary, discretion authorizes the reasonable exercise of judgment in accommodating a statute to a variety of situations, in a fair and equitable manner. We so held in *Doe v. United States*, 100 F.3d 1576, 1583 (Fed. Cir. 1992) ("We are unpersuaded that the lack of statutory guidelines on the appropriate amount to be awarded in a given case renders an award nonjusticiable."). *See also Martin v. Franklin Cap. Corp.*, 546 U.S. 132, 139 (2005) ("Discretion is not whim . . ."). Precedent negates the majority's holding that the NWPA is not a money-mandating statute under the Tucker Act.

The court places weight on the fact that the Secretary of Energy did not issue regulations as provided in 42 U.S.C. § 10156(e)(3). For reasons that are not explained, the Secretary never promulgated regulations for calculating impact assistance payments. The government states that "The option to use federal interim storage expired in 1990, with no generators having ever taken advantage of the program." *In re Private Fuel Storage, LLC*, 56 N.R.C. 390, 395 (Dec. 18, 2002). Whatever the reason for this regulatory inaction, executive inattention does not overturn an act of Congress. The statutory entitlement of state and local governments to "fair and equitable" payments remains a federal obligation. 42 U.S.C. § 10156(e)(2)(A).

I respectfully dissent from the court's ruling that the Nuclear Waste Policy Act is not money-mandating in Tucker Act terms.

## II

### *The Tucker Act's Statute of Limitations bars this action*

The Court of Federal Claims correctly held that the Tucker Act's six-year statute of limitations, 28 U.S.C. § 2501, bars Butte County's claim. The NWPA's nuclear waste storage opportunity ended in 1990, although storage of nuclear core materials from Three Mile Island appears to have continued at the Butte County site. The Court of Federal Claims resolved the issues before it, holding them barred by the Tucker Act's statute of limitations.

Butte County argues that the "continuing claim doctrine" avoided accrual of the statute of limitations. The facts do not support this argument. "In order for the continuing claim doctrine to apply, the plaintiff's claim must be inherently susceptible to being broken down into a series of independent and distinct events or wrongs, each having its own associated damages. . . . [A] claim based

upon a single distinct event, which may have continued ill effects later on, is not a continuing claim." *Brown Park Estates-Fairfield Dev. Co. v. United States*, 127 F.3d 1449, 1456 (Fed. Cir. 1997).  For later-arising claims to be available under the continuing claim doctrine, the claims must be "distinct events each giving rise to a separate cause of action." *Ariadne Fin. Servs. Pty. Ltd. v. United States*, 133 F.3d 874, 879 (Fed. Cir. 1998).  The Court of Federal Claims correctly held that there were no later-arising events to fill the gap from 1990 to the filing of this claim in 2019.  *Fed. Cl. Op.* at 815–19.

I would affirm the decision of the Court of Federal Claims that Butte County's complaint is barred by the statute of limitations.  I respectfully dissent from the majority's erroneous determination that 42 U.S.C. § 10156 is not a money-mandating statute, and the majority's reliance on this determination to decide this appeal.